Gary L. **PENICK** et al., Plaintiffs,

v.

**COLUMBUS BOARD OF EDUCATION**
et al., Defendants.

**Civ. A. No. C–2–73–248.**

United States District Court,
S. D. Ohio, E. D.

March 8, 1977.

Louis R. Lucas, Memphis, Tenn., Nathaniel R. Jones, New York City, Thomas I. Atkins, Boston, Mass., Richard M. Stein, J. Maynard Dickerson, William J. Davis, Leo P. Ross, Columbus, Ohio, for plaintiffs.

Samuel H. Porter, Curtis A. Loveland, Thomas P. Michael, Columbus, Ohio, Mark

O'Neill, Cleveland, Ohio, James W. McCarthy, Asst. Atty. Gen. of Ohio, Columbus, Ohio, for defendants.

### OPINION AND ORDER

DUNCAN, District Judge.

This matter is before the Court following trial on the issue of liability. The Court sets forth hereinbelow its findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

### A. OPENING STATEMENT

The Court has listened to and then carefully examined the evidence in this most important case. After having considered the evidence and applied what I understand to be the law of the United States, I conclude that plaintiffs are entitled to judgment. It is the duty of the Court to set forth the reasons for arriving at that conclusion. In doing so, it is of the utmost importance that all concerned citizens are able to understand this decision clearly. I am well aware that many people are unfamiliar with and distressed by the law of the land which requires that school desegregation decisions, involving the education of our precious children, must often be made by a single judge rather than other governmental officials or the voters. Moreover, the language that the Court and lawyers traditionally use to communicate the reasons for our decisions is often unfamiliar and mysterious to those not trained in the law. In the writing that follows, the Court will strive to avoid language that may not be clear to all who choose to read this decision.

On the other hand, the Court cannot evade its responsibility to counsel in this case who have worked long, hard and sincerely in behalf of their clients. The legal authorities and precedents upon which the Court relies must be communicated to the lawyers. To facilitate a reading and understanding of this opinion, the Court has prepared an appendix containing a glossary of terms and a few maps.

The pages that follow contain a discussion of the evidence presented during the trial of this case, and an application of the law of the United States to that evidence. The Court will endeavor to describe the posture of the Columbus public schools at time of trial, and to examine how it came about. The complexity and the sheer volume of the evidence presented in this case have delayed this opinion long past the point at which the Court would have preferred to have rendered a decision. This delay in reaching a decision should not be construed to reflect a hesitancy on the part of the Court in determining the basic result required by the evidence and the law. I am firmly convinced that the evidence clearly and convincingly weighs in favor of the plaintiffs.

Since 1954, when the United States Supreme Court decided the now famous case *Brown v. Board of Education* ("*Brown I*"), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, our citizens, parents, children, school officials, other local public officials, congressmen, presidents of the United States, and judges have to some degree or other grappled with the effect that this case and those cases that follow it have had upon a system of education that has been a significant contributor to the enormous progress of this nation.

Cases have arisen in the South and now the North, in rural as well as urban school districts, in Cincinnati, Cleveland, Dayton and now Columbus. A school desegregation problem is one we could all do better without, but there is no denying that it is just that—a problem for our community—a problem that simply won't go away if left alone. Although I have mentioned such problems in other areas of the country and Ohio, this case is unique; there are some identifiable similarities, but there are also marked differences. This fact is mentioned only to relate that this decision is based on those facts brought out in this trial and no others.

As mentioned above, I am sure there are those who earnestly believe that matters

such as this should not be the subject of court decisions. Plaintiffs have claimed that they and the class of persons whom they represent have been denied the equal protection of the laws by defendants—thus, a constitutional issue is presented to the Court. Counsel for the Columbus defendants and for the State of Ohio defendants do not dispute the Court's jurisdiction. However, as I view it, the real reason that courts are in the school desegregation business is the failure of other governmental entities to confront and produce answers to the many problems in this area pursuant to the law of the United States. This Court is quick to admit that the litigation model is not the most efficient way to solve problems of far-reaching social impact, but our courts must always protect the constitutional rights of all our citizens.

Therefore, this Court in this case has done its best to find the facts and make reasonable conclusions. If my conclusions are in error, the error will be easy for those who review to discern. It is my duty as a judge of this Court to follow the law—and likewise it now is the duty of the citizens of this community to follow this decision so long as it is the law.

## B. PROCEDURAL HISTORY OF THIS CASE

The Court has jurisdiction of the issues pursuant to 28 U.S.C. §§ 1331(a) and 1343(3) and (4). The civil rights claimed to have been violated are those secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The parties at the trial of this case are as follows and will be so identified in these findings and conclusions:

*Intervening Plaintiffs.* The intervening plaintiffs are 11 students attending schools in the Columbus Public Schools and their parents, representing a class of persons similarly situated. This plaintiff group was permitted to intervene in March, 1975. It is represented by counsel associated with the national office of the National Association for the Advancement of Colored People, one of whom was designated as lead counsel for all plaintiffs by order of the Court. The intervening plaintiffs are sometimes also referred to herein as the "intervenors" or the "plaintiffs."

*Original Plaintiffs.* The original plaintiffs are 14 students in the Columbus Public Schools and their parents, representing a class of persons similarly situated. This action was originally filed on behalf of these students and parents. Following the intervention and the designation of lead counsel, the original plaintiffs and their counsel presented evidence at trial on certain issues that they believed were not included within the case presented by the intervening plaintiffs.

*Columbus Defendants.* The Columbus Board of Education, its seven elected members, and Dr. John Ellis, Superintendent of the Columbus Public Schools, are collectively referred to herein as the Columbus defendants.

*State Defendants.* The State Board of Education, State Superintendent of Public Instruction Dr. Martin Essex, Governor James A. Rhodes, and Attorney General William J. Brown are also named defendants. For ease of reference the "State defendants" will refer to all four of these defendants.

The case was filed on June 21, 1973, by Gary L. Penick and 13 other named children (or their parents) who are students in the Columbus school system. These plaintiffs claimed that 89.5 million dollars earmarked for school construction had to be expended in such a manner as to require the Columbus defendants to carry out affirmative action to guarantee integrated educational experiences. Looking to the Board's resolutions germane to the bond issue from which the construction funds were generated, plaintiffs alleged that those resolutions, the United States Constitution, and a claimed Board reluctance to abide the requirements of its resolutions in their construction planning processes entitled plaintiffs to declaratory and other equitable relief.

On October 9, 1973, the original plaintiffs moved for a preliminary injunction to stop

the construction program. The motion was heard by Judge Carl B. Rubin of this Court on April 15 and 17, 1974. At the time of the hearing, only the original plaintiffs and the Columbus defendants were parties, the Court having previously dismissed the State defendants upon the plaintiffs' own motion. After presenting evidence but before resting, the plaintiffs moved to withdraw their motion and sought leave to file an amended complaint. The Court permitted the withdrawal and amendment.

The original plaintiffs filed their amended complaint on July 19, 1974, renaming the State defendants and adding the Franklin County Recorder as a defendant. A second amended complaint was filed on October 22, 1974.

The second amended complaint was styled as a class action. It alleged that the Columbus defendants had intentionally segregated the public schools by creating and maintaining a neighborhood school policy notwithstanding a segregated housing pattern in the city. The new school construction program was claimed to further segregation. The original plaintiffs also claimed that the Columbus defendants had segregated the schools by using optional attendance areas, by segregating teachers and principals, by failing to desegregate, and by conspiring with the County Recorder to violate the Fair Housing Law of 1968. The State defendants were alleged to be liable for failing to bring about the desegregation of the Columbus schools. The plaintiffs sought an order requiring desegregation of the Columbus Public Schools.

The motion to intervene was filed on February 5, 1975, by NAACP lawyers on behalf of 11 students in the Columbus Public Schools. The applicants for intervention sought permission to file their complaint in intervention, to have the case certified as a class action, and to have them designated as representatives of the class. The complaint in intervention named the Columbus and State defendants, as well as the Franklin County Recorder, who was subsequently dismissed. The complaint in intervention was essentially the same as the second amended complaint. The intervening plaintiffs sought an order requiring the defendants to develop and implement a "system-wide" plan of desegregation.

Although the intervenors sought to represent the same class as the original plaintiffs, the Court granted intervention under Rule 24 of the Federal Rules of Civil Procedure on March 10, 1975. Following a status conference with all counsel, the Court designated one of the attorneys for the intervenors as lead counsel for all plaintiffs.

The trial commenced on April 19, 1976, and was completed on June 17, 1976, after 36 trial days. The record is extensive. Over 70 witnesses were heard and over 600 exhibits were admitted. The trial transcript is in excess of 6600 pages. The Court heard the closing arguments of counsel on September 3, 1976.

## II. PRE–1954 HISTORY OF THE COLUMBUS PUBLIC SCHOOLS

As a necessary starting point, a backward look at the Columbus school district from May 17, 1954, when the Supreme Court of the United States decided the case *Brown v. Board of Education* ("*Brown I*"), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, is required. It is essential that one know the 1954 racial picture of the system—whether it was unitary (no unlawful racial segregation) or dual (unlawful racial separation), and how it became what it was.

This visit with the history of the system is neither for the purpose of dragging out skeletons of the past nor a vindictive finger-pointing exercise. In many respects litigation in court is a matter of hindsight. Perhaps given the present requirements of law, some public officials might have pursued their duties differently—perhaps others would not have. However, this look to the past must be made to discover whether past acts or omissions are in any degree responsible for the admitted current racial imbalance in the Columbus schools.

Prior to 1871, the evidence indicates not only a complete separation of the races in the Columbus school system, but also re-

peated demands by black citizens for adequate schools for black children.[1]

In 1871 the Supreme Court of Ohio decided the case *State ex rel. Garnes v. McCann,* 21 Ohio St. 198. In that case, a black parent challenged an Ohio statute which "authorized and required" all the boards of education in the state "to establish, within their respective jurisdictions, one or more separate schools for colored children, when the whole number, by enumeration, exceeds twenty. . . ." The statute is quoted in the Supreme Court's opinion, 21 Ohio St. at 206. Recognizing that blacks in the post-Civil War era were entitled to protection under the Fourteenth Amendment to the United States Constitution, the Supreme Court of Ohio nevertheless held that the statute providing for separate schools for black children affronted neither the United States nor the Ohio Constitution. Thereafter, in 1878, the General Assembly of Ohio enacted House Bill No. 105, 75 Ohio L. 513, which provided that "where in their judgment it may be for the advantage of the district to do so, [local boards of education] may organize separate schools for colored children. . . ." This statute in turn was repealed in 1887, 84 Ohio L. 34. In passing on the state of the law effective in 1888, the Supreme Court of Ohio held that Boards of Education could not maintain separate schools for black and white students. *Board of Education v. State,* 45 Ohio St. 555, 16 N.E. 373 (1888).

It was 1878 before the first black person graduated from high school in Columbus. In that year all black children attended Loving School at the corner of Long and Third Streets, many passing closer white schools en route. In 1879 a very few blacks attended Second Avenue, Douglas and East Friend schools. However, with only these few exceptions, blacks attended Loving School.

In 1881 by resolution the Columbus Board abolished separate schools for black children. Children were assigned to attend school in districts where they dwelt. Miss Celia Davis, a black woman, taught at the racially mixed Medary school in 1897. Several other blacks taught in mixed schools during the period 1900–1907.

The Columbus Board of Education caused the Champion Avenue School to be built in 1909. The school, located in a predominantly black residential district, was staffed with all black teachers. In August, 1909, Charles W. Smith, a black parent, sued the Columbus Board of Education in the Common Pleas Court of Franklin County, alleging that the Board's action establishing Champion as a black school was illegal under Ohio law. The Court of Common Pleas heard evidence, and on March 11, 1911, dismissed the case. Mr. Smith appealed the dismissal, and on December 31, 1912, the Circuit Court of Franklin County in Case No. 3094 affirmed the trial court's action. On January 6, 1913, Dr. William O. Thompson, one of the members of the Columbus Board of Education, reported to the Board that the Circuit Court had "affirmed the opinion of Judge Rogers, and further held that the creation of a school district is a matter of the discretion of the Board of Education, and not a subject for judicial determination, and dismissed the appeal." Apparently the trend earlier established toward integration then halted in Columbus.

During the 1920's and early 1930's Champion remained a school populated by black students with predominantly black faculty, and a black principal. Although some secondary and elementary schools were attended by both races, all of the black teachers employed in the system were at Champion.

In 1938 Pilgrim Junior High, which had been a racially mixed school, was converted to an elementary school. Champion's then all-black elementary faculty was transferred to Pilgrim, and Champion became a junior high school with a black faculty and black students. The school attendance areas were gerrymandered so that white students who lived very near Pilgrim School were permitted to attend Fair Avenue School, which was considerably more dis-

---

1. See, *e. g., Early Black History in the Columbus Public Schools,* by Myron T. Seifert, historian for the Columbus Public Schools, admitted at trial as plaintiffs' exhibit 351.

tant from their houses on Greenway and Taylor Avenues. While children who lived on those streets had attended Pilgrim before it was converted to an elementary school for black children.

In 1941 all black teachers in the system were employed at Mt. Vernon, Garfield, Pilgrim or Champion Schools, all predominantly black schools. By 1943 five schools were attended almost exclusively by black children, and the faculties of each were composed entirely of black teachers. In September of that year the entire professional staff of Felton School, composed of 13 teachers and a principal, was removed and replaced with 14 black persons. The same kind of 100% white to 100% black faculty transfer had occurred at the Mt. Vernon and Garfield schools in prior years. In September, 1943, the Vanguard League, a civil rights organization, complained to the Columbus Board about gerrymandering as follows:

A more striking example of such gerrymandering is Taylor and Woodland Avenues between Long Street and Greenway. Here we find the school districts skipping about as capriciously as a young child at play. The west side of Taylor Avenue (colored residents) is in Pilgrim elementary district and Champion for Junior High. The east side of Taylor (white families) is in Fair Avenue elementary district and Franklin for Junior High.

Both sides of Woodland Avenue between Long and Greenway are occupied by white families and are, therefore, in the Fair Avenue-Franklin district. Both sides of this same street between 340 and 500 are occupied by colored families and are in the Pilgrim-Champion, or "colored" school, district. White families occupy the residences between 500 and 940, and, as would be expected, the "white" school district of Shepard-Franklin applies.

When *Brown I* was decided in 1954, there were no black high school principals in Columbus. All black administrators were assigned to predominantly black schools. There were no white principals in predominantly black schools. Under the policy and practice of the Columbus defendants' predecessors, black student teachers were required to do their student teaching at predominantly black schools.

Giving full recognition to substantial racial mixing of both students and faculty in some schools, the Columbus school system cannot reasonably be said to have been a racially neutral system on May 17, 1954. The then-existing racial separation was the direct result of cognitive acts or omissions of those school board members and administrators who had originally intentionally caused and later perpetuated the racial isolation, in the east area of the district, of black children and faculty at Champion, Mt. Vernon, Garfield, Felton and Pilgrim. Thus, the Columbus Board of Education maintained what amounted to an enclave of separate, black schools on the near east side of Columbus, thereby depriving hundreds of black children an opportunity for an integrated educational experience. Defendants do not appear to assert that these results were an accommodation to the neighborhood school concept.

In the Court's view, in 1954 the Columbus defendants' predecessors had caused some black children to be educated in schools that were predominantly white; however, the Board also deliberately caused at least five schools to be overwhelmingly black schools, while drawing some attendance zones to allow white students to avoid these black schools. This separateness cannot be said to have been the result of racially neutral official acts. As a result, in 1954 there was not a unitary school system in Columbus.

Over 20 years passed between the decision in *Brown I* and the filing of the second amended complaint in this case. It is necessary now to examine the actions and omissions of the Columbus Board of Education during these decades.

## III. POST–1954 HISTORY OF THE COLUMBUS PUBLIC SCHOOLS

### A. AN OVERVIEW

I agree with the Columbus defendants that "it would be impossible to properly consider the record without beginning with

a review of the tremendous growth that has characterized the entire community of Columbus, Ohio, and the Columbus Public School System in particular, over the past 25 years." From 1950 to 1960 the population of Columbus increased by 95,000 persons while the city more than doubled its land area; in the 1960's, with an aggressive annexation policy, the population increased by over 68,000 persons. The following table illustrates the population growth since 1940:

Columbus, Ohio
Population
1940-1970

| Census Year | Total Population | Increase Since Prior Census | Increase Since Prior Census |
|---|---|---|---|
| 1940 | 303,087 | 15,523 | 5.3% |
| 1950 | 375,901 | 69,814 | 22.8% |
| 1960 | 471,316 | 95,414 | 25.4% |
| 1970 | 539,677 | 68,361 | 14.5% |

Columbus grew from about 40 square miles in 1950 to over 173 square miles in 1975 as a result of 466 separate annexations. Concomitant with the increase in population and land area was a marked rise in the population of the Columbus Public Schools. The enrollment increased from 46,352 in 1950–51 to 83,631 in 1960–61. The growth continued in the 1960's, reaching over 110,000 by the end of the decade. After attaining a high of 110,725, the total declined to 95,998 in 1975–76. Obviously the rapid growth demanded new school facilities and placed pressures upon the school officials seeking to provide quality school facilities for the expanding enrollments in a continually enlarging geographical area.

A closer view of the nature of the population growth shows the dramatic increase of black Columbus residents. In 1940, 11.7% of the population was black. During the next 30 years, the black population almost tripled; in 1970, 18.5% of the total population was black. This growth was reflected in the composition of the public school population. In 1970, 29% of the enrollment was black, as compared to the city's overall 18.5% black population.

It is clearly apparent to the Court that there is residential segregation in Columbus. On this point, plaintiffs and the Columbus defendants are in agreement. In 1970, 71% of all blacks lived within 23 contiguous census tracts. Although census base maps received in evidence at trial give some aid in the identification of the racial composition of particular census tracts, one cannot view them as accurately descriptive of the racial characteristics of any tract in any years intervening the compilation of census data. This is particularly so in those cases where maps were color-coded reflecting racial composition without reference to the density of the total population. There are instances of large color-coded areas where few people live. For example, the Columbus State Hospital's assigned color code is of graphic significance but concerns an area of low population density.

The census base maps, however, do provide a reasonable basis for my finding that from 1959 through 1970, the heaviest concentration of black residents of Columbus has been in contiguous areas which have spread from the central area of the city to the east, northeast, and to a lesser degree to the southeast.

It is true that the Columbus Board of Education had to be seriously concerned not only with accommodating the increase in the numbers of children to be educated, but also with upgrading and expanding its educational program. Improvements and programs, such as reduced class size, library leaning centers, and special and vocational education, all reduced school capacity or required entirely new facilities. Actually, in 1949 the Columbus school plant was inadequate even for the 44,531 students then enrolled.

In 1950, pursuant to a request of the then Columbus school superintendent, the Bureau of Educational Research at The Ohio State University began a comprehensive, scientific and objective analysis of the school plant needs of the school system. The Bureau studied and reported on community growth characteristics, educational programs, enrollment projections, the system's plan of organization, the existing

plant, and the financial ability of the community to pay for new school facilities. Thereafter, a number of general and specific recommendations were made to the Columbus Board by the Bureau. The recommendations included the size and location of new school sites as well as additions to existing sites. The recommendations were conceived to accommodate the so-called "community or neighborhood school concept." The 1950 concept was related to a distance criteria grounded on walking distance to schools as follows: ¾ mile for elementary, 1½ miles for junior high and 2 miles for senior high students.

The Board of Education adopted and relied upon the Bureau's recommendations in proposing and encouraging the passage of bond issues in 1951, 1953, 1956, 1959 and 1964. School construction of new facilities and additions to existing structures were accomplished in substantial conformity with the Bureau's periodic studies and recommendations.

The rapid growth of Columbus also demanded a larger professional staff to serve the city's schools. The numbers of black professionals employed by the Columbus Board has increased since 1969 from 632 or 11.8% of the total number of 5,349, to a 1975 high of 926 or 17.5% of a total 5,298.

In 1951 a cadet principal program was begun. In 1972 27 persons were selected as cadet principals; 13 of them were black. Since 1969, 44 of the 100 cadet appointments have been black teachers. In the last five years the number of black administrators assigned has increased from 44 to 69, a 56.8% increase during that time. However, in 1954 there still were no black high school principals in Columbus, and by 1956 there still were no black administrators in any but the black schools, and no white principals in the black schools. Although the number of black administrators at majority white schools increased from only four in 1971 to fourteen in 1975, the number remains proportionately low.

Between 1964 and 1973 the Columbus defendants generally maintained their prior practice of assigning black teachers to those schools with substantial black student populations. As an example, as late as the 1972–73 school year, there were 250 black elementary teachers assigned to schools in which the student body was 80–100% black, which represented 63.3% of all of the black elementary teachers in the system. In the same school year, 34 elementary schools, all of which contained 80–100% white student bodies, had no black teachers assigned to them.

In July, 1974 the Columbus defendants consummated a conciliation agreement with the Ohio Civil Rights Commission after a complaint had been filed by the Columbus Area Civil Rights Council alleging faculty racial segregation. The agreement included the following language:

The Plan will also insure that the experienced teachers and teachers with advance training and degrees shall be reasonably distributed throughout the school system.

. . . . .

To the degree possible, the goals established in this plan shall be accomplished by September 1973 through a process of *voluntary transfers* and *selective assignments* of new professional staff members. Such a process shall be supplemented by *required assignments* of present professional staff members, as needed, . . (Emphasis added.)

Of special note here is Section 5 of the plan which read:

The assignment and transfer of professional members to and from schools *where the average training and experience of professional staff members is significantly below the system average* shall be made so that this differential is reduced or as a minimum not significantly increased. (Emphasis added.)

It is true, as plaintiffs claim, that the Columbus defendants were not at the time of trial 100% in conformity with the agreement. The Court believes that the failure to completely comply with the strict letter of the requirements of the agreement does not represent a substantial factual matter helpful in the resolution of the issues in this case.

In 1965 the Columbus Board created the Council on Intercultural Education to obtain advice and suggestions on racial matters involving the schools. In August, 1966 the local chapter of the NAACP presented a position paper to the Council protesting that unconstitutional school segregation was abroad in the Columbus schools and suggesting procedures for desegregation. In May, 1967 the Columbus Urban League called for the integration of the school system and suggested how it could be accomplished. The Columbus Board in 1967 officially adopted a policy to take racial balance into consideration in drawing attendance zones. In addition the Columbus Board adopted a voluntary transfer program to improve racial balances. Under a plan as adopted, students were eligible to transfer schools if the transfer resulted in better racial distribution at each school; no transportation was provided. This plan existed for six years, and had little integrative impact on the school system.

In 1969 the voters defeated a $75,950,000 school bond issue. In 1971 a representative committee was formed under the name Project UNITE to study the needs of the school system. A sub-committee of that group identified specific facility needs and made recommendations to the Board of Education. A November 1972 bond issue was approved by the voters. Included in the promised proposed construction program was a commitment to giving each student the opportunity for integrated educational experiences through the use of new special, magnet-type developmental learning centers, district-wide career centers, special programs to attract students from other schools, and a commitment to locate new buildings whenever possible to favor integration without resorting to unreasonable gerrymandering. But see the discussion concerning the Innis Road and Cassady Elementary schools in Part B of this section.

Perhaps best descriptive of the philosophy of the Columbus Board is its July 18, 1972, officially-adopted formal goal statement on integrated education:

It shall be the goal and the policy of the Columbus Public Schools to prepare every student for life in an integrated society by giving each student the opportunity of integrated educational experiences. Such a goal does not imply the mandatory or forced transportation of students to achieve a racial balance in any or all schools. The Superintendent of Schools shall implement this policy by the development of proposals for the approval of the Board of Education. The first priority of the Superintendent shall be the development of a plan to provide the transportation necessary to give all students access to vocational and career facilities and all special programs or courses offered by the Columbus Public Schools.

In late November, 1972 the Columbus Board voted down a resolution which would have established a site selection advisory committee to assist the Board in preventing new schools from being built on sites which would result in racially identifiable new schools. Likewise, on May 1, 1973, the Columbus Board rejected a motion that it seek the assistance of the State Department of Education in obtaining financial and technical assistance to desegregate the schools. By vote this Board also decided not to request federal funds with which to desegregate. On September 3, 1974, the Board passed a resolution providing that the Superintendent devise a more effective means of making available more integrated educational opportunities by September 1, 1975.

In April, 1973 the Columbus Board formally adopted the "Columbus Plan." The first version provided for four types of student transfers: racial balance, vocational program, educational program, and occupational program. Only since 1975 has the Board provided transportation for the full-day racial balance transfers. In the 1975–76 school year, 3,612 students participated in Columbus Plan transfers; of these, 584 full-day transfers were for racial balance. Even more voluntary participation was expected in 1976–77.

In the school year 1975–76 four alternative or magnet schools were in operation.

Two more will be open in 1976–77. Four new career centers, which hopefully will have an integrative effect, will be fully operational by 1977, involving about 4,000 students. Integrated study trips, all-city activity and exchange activity all have been engaged in and encouraged in an effort to provide positive integrated experiences.

Nevertheless during the 1975–76 school year, when this case was tried, 70.4% of all the students in the Columbus Public Schools attended schools which were 80–100% populated by either black or white students; 73.3% of the black administrators were assigned to schools with 70–100% black student bodies; and 95.7% of the 92 schools which were 80–100% white had no black administrators assigned to them.

## B. SPECIFIC ACTIONS—POST–1954

In deciding the issues of the case, a close review of the racial composition over the years of the Columbus School system is helpful. Since the Department of Health, Education and Welfare began to require that racial statistics be submitted, a rather accurate appraisal of the racial character of the schools can be made. For those years when no such data were kept, the numbers of students of one race or another cannot accurately be determined; however, a hindsight review of other social statistics provides a basis to make reasonable inferences as to the probable racial composition of the schools for those years.

■ In making the analysis that follows, the Court has not forgotten the truism that the mere presence of racial imbalance in the make-up of school student bodies, without more, will not permit a finding of unconstitutional segregation.

To analyze the mass of statistical evidence received at trial, it is necessary for the Court to establish a frame of reference. Plaintiffs' expert witness, Dr. Gordon Foster, used statistical criteria in terming a school "racially identifiable." Using actual or estimated racial statistics concerning the

black student enrollment in the total Columbus school system, he applied a statistical variance formula (plus or minus a specific percentage point range, chosen by reference to the relative size of the overall black student enrollment in a given time period) to the system-wide average to establish a rough yardstick for determining whether the percentage of black student enrollment in particular schools was within the general range of the system-wide average. See the definition of "racially identifiable" in the glossary in the appendix to this opinion. For the period of 1950 to 1957, he estimated the black student enrollment to be approximately 15% of the total enrollment. Because of the small percentage of blacks in the system as a whole, the measure of racial identifiability he adopted was plus or minus 5%. In 1957, he used an estimate of 20% non-white population and a range of plus or minus 10%. In 1964, he used an estimate of 25% non-white and 26.6% non-white at the secondary level and a range of plus or minus 15%. In 1975, he used the actual racial percentage of 32.5% non-white and a plus or minus 15% range. Dr. Foster testified that whenever there was a close situation, he called the school racially unidentifiable. The Court notes the necessity for using the smaller range when the percentage of black pupils was at a low level in the system. Similar ranges have been used by some courts as a rough gauge for measuring the racial identifiability of schools. There is ample evidence to support the use of such ranges and the evidence indicates that Dr. Foster's estimates are reasonable.

■ Based upon the law as it is set out in Part IV of this opinion, I am constrained, from certain facts which I believe to be proved, to draw the inference of segregative intent from the Columbus defendants' failures, after notice, to consider predictable racial consequences of their acts and omissions when alternatives were available which would have eliminated or lessened racial imbalance.[2] And although defend-

---

2. Evidence was introduced in attempt to prove or disprove racial preferences in student trans-

fers, assignment of non-teaching and non-administrative employees, assignment of students

ants have contended that the Columbus Board of Education's actions since 1954 have been racially neutral, the plaintiffs' proofs included a number of Board actions which cannot reasonably be explained without reference to racial concerns.

### School Construction

The area of site selection for school construction is a particularly difficult subject. Looking with hindsight on what was done, we must not only consider the effect of the Columbus defendants' site selection decisions, but also ask what other steps could or should have been taken. Many factors must be considered in making site selections for new schools, including acquisition and construction costs, the present demography and projected development, the availability of services, accessibility, and public relations. It is rarely possible to isolate and identify any particular factors which were ultimately determinative in the selection of a site. The evidence does show that all of these factors were considered when the need for new school facilities arose and a site was selected. The evidence also shows that in many cases alternative site selections were suggested. Many of the probable consequences of particular alternatives were predictable and known to the Columbus defendants.

The Columbus defendants have contended throughout that they have followed a neutral neighborhood school policy. In keeping with that policy, schools have generally been built in locations where the expanding and growing population demanded additional facilities. Of 103 schools constructed between 1950 and 1975, 87 opened with a racially identifiable student body according to the calculations of Dr. Foster. Of the 87 schools, three have been closed. These schools closed with racially identifiable student populations. Seventy-one of

the 87 new schools remained racially identifiable at the time of trial.

It is necessary for the Court to consider those foreseeable effects of the construction practice which promote or preserve a segregated school system. It is apparent to the Court, and presumably to the defendants, that schools which open with a racially identifiable student body tend to stay that way. The Court finds that in some instances initial site selection and boundary changes present integrative opportunities.

The evidence supports a finding that the Columbus defendants could have reasonably foreseen the probable racial composition of schools to be constructed on a given site. In some instances the Columbus defendants had actual knowledge of the likelihood that some schools would open and remain racially identifiable if built on the proposed sites. One such case was Gladstone Elementary School. See map 1 in the appendix to this opinion. Although Gladstone was apparently opened in 1965, the first statistics available concerning its racial composition concern the year 1966, when it had a student population which was 78% black. Gladstone's black enrollment has been in excess of 90% since 1967. Mr. Lumpkin, who later became the president of the Gladstone Parent Teacher Association, testified that prior to its construction he communicated to the Board of Education that Gladstone would predictably open as a predominantly black school. The 1960 census map shows that in that year the area in which Gladstone was eventually built was predominantly white. The 1970 census map indicates that this same area was predominantly black. This reflects the definite trend of an expanding black population northward into this area in the 1960's. This trend was fairly well advanced in 1966, given Gladstone Elementary's 78% black enrollment that year.

and substitute teachers and special education programs. The plaintiffs' proofs regarding these matters do not bear sufficient impact to be helpful in the resolution of the issues.

It is noted that the assignment of non-professional staff is racially suspect; however, the

Court does not find sufficient nexus between that fact and the issues being litigated, and it is not a part of the factual setting from which the Court draws conclusions against defendants.

Gladstone was built between Hamilton Elementary and Duxberry Park Elementary with the greater portion of the Gladstone attendance zone being drawn from the southwestern portion of the former Duxberry zone. This section of Duxberry had a higher black density than did the northern and eastern sections. Thus, the black student population in Duxberry dropped from 40% in 1965 to 33% in 1966. Linden Elementary, to the north of Hudson Street, remained virtually 100% white throughout the middle 1960's. The construction of Gladstone south of Hamilton and Duxberry served to contain the black student population in the area south of Hudson Street.

The need for greater school capacity in the general Duxberry area would have been logically accommodated by the construction of Gladstone north of its present location, nearer to Hudson Street. This would, of course, require some redrawing of boundary lines in order to accommodate the need for class space in Hamilton and Duxberry. If, however, the boundary lines had been drawn on a north-south pattern rather than an east-west pattern, as some suggested, the result would have been an integrative effect on Hamilton, Duxberry and the newly-constructed school.

·The Court also finds that the site selection and attendance zone boundaries for Sixth Avenue Elementary resulted in a foreseeably blacker school. Sixth Avenue opened as a primary center (grades K–3) in 1961 and closed in 1973. During this entire period, Sixth Avenue was racially identifiable with a black student population of at least 85%.

The Sixth Avenue school was built in accordance with a recommendation contained in the 1958–59 study of the Public School Building Needs of Columbus, Ohio. Recommendation number 11 on page 58 of that document describes an area bounded by High Street on the west, Chittenden Avenue on the north, New York Central Railroad on the east, and Fifth Avenue on the south. Sixth Avenue elementary was built on the proposed site. The attendance zone for Sixth Avenue was as recommended, except that Fourth Street was its western boundary. This area can generally be described as the eastern portion of the Weinland Park Elementary attendance zone and the northeastern corner of the Second Avenue Elementary attendance zone. Both the 1960 and 1970 census maps (and the underlying statistical data) show that these portions of the former Weinland Park and Second Avenue Elementary attendance zones had the highest percentage of black residents within the area. The census data shows that the population west of Fourth Street was largely 0 to 27.9% black with two or three blocks being in the 28 to 49.9% range. The east side of Fourth Street is generally in the 50 to 89.9% black range, with several blocks in the 90 to 100% black category. The Sixth Avenue attendance zone consists almost entirely of 50 to 100% black population. The black population in the area left within the attendance zones of Weinland and Second after Sixth opened is generally below 27.9%, with a few blocks in the 28% to 49.9% range.

In 1964, three years after Sixth Avenue opened and the first year for which racial statistics are available, Sixth Avenue had a black student enrollment of 91%. In that year Weinland Park and Second Avenue had black student populations of 30% and 28%, respectively. The boundary lines for these schools remained relatively unchanged until 1973, when Sixth Avenue closed. Sixth Avenue closed with a black enrollment of 94.6%. In that year Weinland Park and Second had black enrollments of 30.5% and 16.7%, respectively. In the 1974–75 school year following the closing of Sixth Avenue, the boundary lines for Weinland and Second were redrawn to resemble the 1960 attendance zones. With the closing of Sixth the black population of Weinland rose from 30.5% to 46.7% while Second Avenue rose from 16.7% to 20.7%. The Court finds that the construction site and attendance zone drawn for Sixth Avenue Elementary between 1961 and 1973 resulted in Sixth Avenue being the black school in the area while making Weinland Park and Second Avenue whiter.

The impact of building a new elementary school at the Sixth Avenue location and drawing the attendance zone boundaries where they were drawn was clearly foreseeable to the Columbus defendants. Some students living in the area east of Fourth Avenue, shown to be predominantly black on both the 1960 and 1970 census maps, were compelled to walk to Sixth even though Weinland Park was closer to their homes. Even if the Court were to find compelling non-segregative reasons for the construction of this new school on its Sixth Avenue site, it is readily obvious from the census maps that the objectives of racial integration would have been better served, without abandoning the neighborhood school policy, by drawing the attendance zones east and west between High Street and the railroad tracks, rather than north and south along Fourth Street. The Columbus defendants have offered no explanation for the fashion in which Sixth Avenue was opened and maintained during this period.

The Court is well aware of the Board's obligation to provide class space as the need arises, whether it be in an area of expanding geographic growth, or within the inner-city area due to increasing population or the closing of obsolete structures. Given segregated residential patterns, not all schools can be built in an integrated setting. In such circumstances the selection of sites for new schools alone may not serve as a tool for integration. The intervening plaintiffs argue that the construction of a school in an area known to have been covered by racially restrictive covenants and subject to discriminatory real estate practices constitutes an impermissible participation by the school officials in racial discrimination. The Court does not infer segregative intent from the mere construction of schools in an area needing the facilities even though that area had been covered by racial covenants. Without the use of pairings, transportation, or other techniques, the racial imbalance in these schools could not have been cured by the siting of schools even had the Columbus defendants devoted their attention to the racial integration of the schools.

The opportunity for active integration did exist, however, without the use of transportation, in some parts of the city. Even greater integration could have been achieved with the use of pairings and limited transportation. This opportunity existed, and continues to exist in those areas of the city where the population shifts from one race to another. An examination of the census maps for the years 1950, 1960 and 1970 discloses a general pattern of high density (50 to 100%) black population in the center of the city fringed by areas of lesser, but still substantial, (10 to 50%) black population. The remainder of the city is predominantly white, although there are pockets of white population within the central city area, and pockets of black population in the outlying areas.

The Columbus defendants argue that housing in the City of Columbus is segregated as a result of private discrimination and other factors affecting residential development over which the school board has no control and little influence. The Columbus defendants maintain that they have adopted a racially neutral neighborhood school policy. They contend that the use of a neighborhood school policy in a city with segregated housing patterns results, through no fault of the school authorities, in racially imbalanced schools. Under the neighborhood school policy, the site selected for a new school limits the attendance zone boundaries that can be drawn for that school. The evidence shows that in some instances the need for school facilities could have been met in a manner having an integrative rather than a segregative effect.

### The Near-Bexley Option

East of the downtown area of Columbus and entirely surrounded by the Columbus city limits, lies the City of Bexley, Ohio. East of Bexley, and also entirely surrounded by the Columbus city limits, is the City of Whitehall, Ohio. With the exception of one small area of Columbus which jumps across Alum Creek to the eastern side of the creek, the western boundary of Bexley follows the course of Alum Creek. The

Columbus residential area to the west of Alum Creek was in 1960 and 1970, according to census data, heavily populated by blacks. For that area in those years, census tracts generally appear as either 50–89% black or 90–100% black. A different picture existed for the area to the east of Alum Creek, encompassing the City of Bexley and the small portion of Columbus which lies immediately east of the creek. According to census data, 99% of Bexley residents were white in 1960, and 99.3% were white in 1970. Census data further indicate that in 1960 there were 159 people residing in that area of Columbus which lies immediately east of Alum Creek; all of these people were white.

From the 1959–60 school year through the 1974–75 school year, the Columbus Board of Education established and maintained an optional attendance zone encompassing the area of Columbus which lies directly east of Alum Creek. Students living in that area were within the attendance areas of schools located to the west of Alum Creek, nearer the Columbus downtown area. This 1959–1975 option permitted these students to elect to attend Columbus city schools located to the east of the City of Bexley. For ease of reference, the Court will refer to this option as the "Near-Bexley Option."

Absent the Near-Bexley Option, students living in the optional zone area would have been required to attend Fair Avenue Elementary (opened in 1890), Franklin Junior High School (opened in 1898) and East Senior High School (opened in 1922). The following statistics are applicable to these near-east side schools:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Fair Avenue Elem.** | | | |
| % black students | 92.0 | 95.0 | 96.7 |
| % black faculty | 83.3 | 37.1 | 23.3 |
| **Franklin Jr. H.S.** | | | |
| % black students | 85.8 | 96.3 | 93.7 |
| % black faculty | 32.6 | 34.6 | 45.8 |
| **East Sr. H.S.** | | | |
| % black students | 94.9 | 98.9 | 98.9 |
| % black faculty | 12.7 | 28.9 | 31.3 |

The schools on the receiving end of the option were Fairmoor Elementary (opened in 1950), Eastmoor Junior High School (opened in 1962) and Johnson Park Junior High School (opened in 1958), and Eastmoor Senior High School (opened in 1955). The following statistics are applicable to these schools:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Fairmoor Elem.** | | | |
| % black students | 0.1 | 0.9 | 4.6 |
| % black faculty | 0 | 4.0 | 18.2 |
| **Eastmoor Jr. H.S.** | | | |
| % black students | 30.5 | 34.4 | 45.3 |
| % black faculty | 0 | 9.8 | 15.2 |
| **Johnson Park Jr. H.S.** | | | |
| % black students | 0.3 | 2.9 | 26.7 |
| % black faculty | 0 | 2.0 | 12.7 |
| **Eastmoor Sr. H.S.** | | | |
| % black students | 10.6 | 17.8 | 34.9 |
| % black faculty | 0 | 4.0 | 15.2 |

Eastmoor Junior High School was a receiving school for the Near-Bexley Option during the 1959–60, 1960–61, and 1963–64 through 1974–75 school years. Johnson Park was a receiving school for the option during only the 1961–62 and 1962–63 school years; there are no racial statistics available for Johnson Park Junior High School for these two years. The 1960 census data indicate that the Johnson Park attendance area was predominantly white at that time.

The Near-Bexley Option, then, concerned a small, white enclave on Columbus' predominantly black near-east side. The option area, although part of Columbus, had more in common, geographically and racially, with Bexley than with Columbus. In practical effect, the Near-Bexley Option permitted white students in the optional zone to escape attendance at black Fair Avenue Elementary, Franklin Junior and East Senior High Schools, and permitted them instead to attend white (or whiter) Fairmoor Elementary, Eastmoor Junior or Johnson Park Junior, and Eastmoor Senior High Schools. And, as an examination of maps 2, 3, and 4 in the appendix demonstrates, to exercise the option Columbus

students had to traverse the City of Bexley to arrive at the option schools.

Nothing presented by the Columbus defendants at trial, at closing arguments, or in their briefs convinces the Court that the Near-Bexley Option was created or maintained for racially neutral reasons. The Court finds that the option was not created and maintained because of overcrowding or geographical barriers.

These defendants contend that the option involved only a few students. The July 10, 1972, minutes of the State Board of Education, at page 44, appear to indicate that in 1972, there were 25 public elementary school students and two public high school students residing in the optional zone. However, the fact that the option was created, and maintained by the Columbus Board of Education for some 16 school years, is of itself some evidence that the option was not merely a paper exercise.

The Court is not so concerned with the numbers of students who exercised or could have exercised this option, as it is with the light that the creation and maintenance of the option sheds upon the intent of the Columbus Board of Education. It is noteworthy that the July 10, 1972, minutes of the State Board of Education indicate awareness by the State Board that a proposed transfer of the Near-Bexley Option area to the Bexley school district "[r]aises the question of percentage of racial mix." (The proposed transfer was opposed by the Columbus Board of Education, and was denied by the State Board.) Quite frankly, the Near-Bexley Option appears to this Court to be a classic example of a segregative device designed to permit white students to escape attendance at predominantly black schools.

### Highland, West Mound and West Broad Elementary Optional Zones and Boundary Changes

Another area illustrative of action by the Board promoting racially segregated

schools is on the west side of Columbus. Four elementary schools are involved: Burroughs, Highland, West Broad and West Mound. The census data for the years 1950, 1960 and 1970 show an area of black population between West Broad Street and Sullivant Avenue bounded on the west by Eureka Avenue and on the east by the Columbus State Institute. This area is referred to locally as the Hilltop. The western portion of this area fell mostly in the 50% to 100% black range. The eastern portion, between Belvidere and the Columbus State Institute, was in the 0 to 9.9% black range in 1950 and has become increasingly blacker in later years. The 1970 census data shows this area to have several blocks in each of the ranges of 10 to 27.9%, 28 to 59.9% and 60 to 89.9% black.

Highland Elementary has served the majority of this area between 1950 and the present. During this period the Columbus defendants established two optional attendance zones within the Highland boundaries, and also changed the attendance zone boundaries of Highland. Although the opportunity existed for the integration of the four elementary schools in this area, the option zones and boundary changes tended to preserve and promote the racial imbalance of these schools.

One optional zone appeared in 1955 and continued through the 1956–57 school year. See map 5 in the appendix. In those years, and since 1939, the Highland attendance zone included an area north of West Broad Street to the Pennsylvania Railroad tracks bounded on the west by Eldon Avenue and on the east by the Columbus State Hospital. This portion of Highland north of Broad Street was composed in each of the census years, 1950, 1960 and 1970 of blocks in the 0 to 9.9% black range, as was the entire West Broad attendance zone. For the school years 1955–56 and 1956–57 that portion of Highland north of Broad was made into an optional attendance area with students having the option of attending the predomi-

nantly white West Broad or the predominantly black Highland.

Highland was 63 students over capacity in 1955, and 67 students over capacity in 1956. West Broad, however, was also over capacity in 1955 and 1956 by 115 and 113 students, respectively. An examination of the attendance zones in the West Broad Street area reveals that several required students to cross this street to reach their school. The Court concludes that the Highland-West Broad optional zone was not created to alleviate overcrowding or because of a geographic barrier. This optional zone allowed the white students north of Broad Street to escape Highland and go to West Broad. The result was to contain blacks within Highland and to maintain West Broad as a predominantly white school.

In 1957 the boundary lines for Highland and West Broad were redrawn, eliminating the option zone and placing that area permanently within the West Broad attendance zone. Because West Broad's capacity problems were greater than those of Highland, a purpose of the boundary change could not have been to alleviate the overcrowding at Highland. Since the West Broad attendance zone dipped south of Broad Street west of the Highland zone, the Court concludes that West Broad Street was not considered a geographical barrier in the decision to redraw these boundaries.

In 1964, the first year in which the racial statistics for enrollment are available, Highland had a black student enrollment of 75%. West Broad Street was 100% white in 1964. The Court finds that the optional attendance zone and boundary changes between Highland and West Broad had a foreseeable and actual effect of promoting racial imbalance.

Another optional attendance zone was created within the Highland boundaries in 1955. This optional zone was in the southeastern corner of Highland and gave the students living there the option of attending either Highland or West Mound Street. See map 5 in the appendix. This option

continued through the 1960–61 school year. The census data for 1950 shows that the West Mound Street attendance zone was, with the exception of one block, within the range of 0 to 9.9% black. The remaining block was in the 10 to 27.9% black category. In 1960 the West Mound attendance area was still largely in the 0 to 9.9% black range with four blocks in the 10 to 27.9% category and one block in the 28 to 49.9% range. The option area east of Wrexham and south of Doren was in the 0 to 9.9% black range in the 1950 census. In the 1960 census the option area continued to be predominantly white with a small portion falling in the 10 to 27.9% black range.

The effect of the Highland-West Mound option was to allow those students living in the whiter portion of the Highland attendance zone to opt out of attendance at identifiably black Highland in favor of the whiter West Mound Street School. The defendants contend that this optional zone was created to alleviate overcrowding in Highland. During the option years Highland was over capacity and West Mound Street was under capacity ranging from four students below capacity in 1957 to 105 in 1960. The effect of the option on the overcrowding at Highland was the foreseeable result that the white students within the option zone would exercise the option to attend West Mound. Thus, even though an option zone may have eased the capacity problem, this particular option zone tended to make Highland blacker and West Mound whiter. In 1961 the option was terminated and the greater part of the option area was rezoned permanently to West Mound Street.

The intervening plaintiffs have shown that feasible alternatives were available and known to the Columbus defendants. One of these alternatives was to move the option area to the west, or make the boundary changes west of where they were made. This alternative would have allowed students from the blacker part of the Highland attendance area to attend West Mound, thus having an integrative effect on West

Mound while easing the overcrowding at Highland. Another alternative would require redrawing the attendance zones in this area for Highland, West Mound, West Broad, and Burroughs. Dr. Foster testified that the total capacity of these four schools was 3,060 at the time of trial and the enrollment was 2,773. The following statistics are applicable to these schools:

| Burroughs | 1964 | 1969 | 1974 |
|---|---|---|---|
| % black students | 16 | 14.6 | 12.5 |
| % black faculty | 0 | 3.1 | 18.5 |
| **Highland** | | | |
| % black students | 75 | 71.7 | 72.7 |
| % black faculty | 4.6 | 22.6 | 16.7 |
| **West Mound** | | | |
| % black students | 15 | 16.1 | 16.5 |
| % black faculty | 0 | 7.7 | 17.4 |
| **West Broad** | | | |
| % black students | 0 | 0.7 | 1.0 |
| % black faculty | 0 | 3.0 | 12.1 |

The racial balance at all four schools could have been enhanced by redrawing the attendance zones for these four schools through the Hilltop area. This could also be achieved by pairing. The Court finds each of these alternatives to be feasible and there has been no showing that they are unsound as a matter of academic administration. The Court concludes that the actions of the Columbus defendants had a substantial and continuing segregative impact upon these four west side schools.

### Moler Elementary Discontiguous Attendance Area

In the early and mid-1960's, the Columbus° Board of Education was faced with overcrowded elementary schools in the southeastern area of the Columbus school district. Stockbridge Elementary, Alum Crest Elementary, Watkins Elementary and an addition to Stockbridge Elementary were opened in the southeastern area during this period. In the 1963–64 school year, the Board of Education assigned the eastern portion of the Watkins Elementary School attendance area to Moler Elementary School. This eastern portion of the Watkins area did not abut the Moler attendance area. See map 6 in the appendix. To arrive at Moler, students living in the discon- tiguous attendance area were transported through the Alum Crest attendance area. This discontiguous attendance area remained in effect through the 1975–76 school year, when this case was tried.

Census data for 1960 indicate that neither the Moler attendance area proper nor its discontiguous attendance area had a significant number of black residents. The same census showed that the Alum Crest attendance area did have a significant black population. The following statistics are applicable:

| | 1964 | 1969 | 1974 |
|---|---|---|---|
| **Alum Crest Elem.** | | | |
| % black students | 50 | 77 | 78.7 |
| % black faculty | 33.3 | 40 | 25 |
| **Moler Elem.** | | | |
| % black students | 0.2 | 8.7 | 50.1 |
| % black faculty | 0 | 10.5 | 11.8 |

Between September, 1966 and June, 1968, about 70 students, most of them white, were bused daily past Alum Crest Elementary from the discontiguous attendance area to Moler Elementary. The then-principal of Alum Crest watched the bus drive past the Alum Crest building on its way to and from Moler. At the time, the Columbus Board of Education was leasing 11 classrooms at Alum Crest to Franklin County. There was enough classroom space at Alum Crest to accommodate the students who were transported to Moler. When the principal inquired of a Columbus school administrator why this situation existed, he was given no reasonable explanation.

The Court can discern no other explanation than a racial one for the existence of the Moler discontiguous attendance area for the period 1963 through 1969.

### The Heimandale Discontiguous Attendance Area

The Fornof Elementary attendance area is in the southern part of the Columbus school district. To the east of the Fornof area, and adjacent to it, is the Heimandale Elementary attendance area. The 1950 census shows no appreciable black population in either attendance area. The 1960 census indicates that Fornof's area re-

mained predominantly white, with all census tracts having less than 10% black residents. The Heimandale attendance area, on the other hand, reflects a substantial black population by 1960, with most of the area between 28% and 50% black, and some tracts as high as 90–100% black. The 1970 census data for both areas are similar to the 1960 data. In 1964, the first year for which such statistics are available, Fornof had 0.2% black students, and no black faculty members. In the same year, Heimandale had 40% black students and 40% black faculty.

For six school years, from 1957–58 through 1962–63, the Columbus Board of Education perpetuated a discontiguous attendance area involving Heimandale and Fornof. Students living on three streets (Wilson, Bellview and Eagle Avenues) located near the center of the Heimandale attendance area were assigned to attend Fornof instead of Heimandale. Less than 10% of the persons living on these streets were black. There was no geographical or capacity justification for the Heimandale discontiguous attendance area. The existence of this area meant that students living on Wilson, Bellview or Eagle Avenue did not attend their neighborhood school, Heimandale, which had a significant number of black students, and did attend Fornof, which was a racially identifiable white school.

### The Innis-Cassady Alternatives

In 1971, the Columbus school district absorbed the Mifflin school district. The area involved is north of the City of Bexley, between 13th Avenue and Morse Road. The Mifflin school district had been in poor financial straights; schools in the district were severely overcrowded. The Columbus Board of Education initially maintained the Mifflin district boundary as a school attendance area, but was required to assign some pupils to a nearby temporary facility while more permanent arrangements were being made.

The north-south length of the area involved is greater than the east-west breadth. Cassady Elementary School, opened as a Mifflin school in 1964, is located on Agler Road roughly midway between 13th Avenue and Morse Road. The residential area south of Agler Road was and is predominantly black, while the area north of Agler Road was and is predominantly white. Because Cassady Elementary was so overcrowded, the first school built with funds raised under the 1972 bond issue was Innis Road Elementary School, which was intended to alleviate the overcrowding at Cassady. Innis was built to the north and west of Cassady; it opened in 1975.

The Columbus Board of Education had announced in 1972 that improved racial balance of student enrollment was a factor which was relevant in site selection and boundary drawing. In 1975, prior to the September opening of Innis Road Elementary, the administrative staff of the Columbus Public Schools presented to the Columbus Board of Education two alternative attendance proposals concerning Innis and Cassady. Dr. John Ellis, Superintendent of the Columbus Public Schools, explained at trial why two options, rather than a single recommendation, were presented to the Board:

> The basic reason was to see, as we attempt to wrestle with the very difficult issue of how can we insure we are doing everything that we can that is reasonable and appropriate and right to increase the approved integration within the Columbus School District. We are honestly attempting to achieve that end, and we looked at a couple of different alternatives in these cases to see whether or not we could come up with a better plan than—to see if there was a better approach, and as it turned out, both approaches had some problem with the standpoint of distances and transportation and crossing highways and preferences of people and a host of factors that go into the establishment of boundaries.

Dr. Ellis and Mr. Robert W. Carter, Executive Director of Administration, Columbus Public Schools, both testified at trial that in their respective opinions, the alternatives

presented to the Board of Education concerning Innis and Cassady were both educationally sound. The administrative staff did not recommend one alternative over the other.

One alternative entailed dividing the old Mifflin district into two attendance areas, with a horizontal boundary line dividing an Innis attendance area to the north from a Cassady attendance area to the south. The administrative staff and the Board of Education knew that adopting this alternative would mean that Cassady would draw its enrollment from the predominantly black southern portion of the old Mifflin district, while Innis would draw its enrollment from the predominantly white northern portion.

The other alternative entailed maintaining the old Mifflin district as the attendance area for both Cassady and Innis, with one school designated as a primary center (kindergarten through third grade) and the other as an intermediate school (grades four through six). The administrative staff and the Columbus Board of Education knew that adopting this alternative would mean that the black student enrollment in each school would be roughly equivalent to the white student enrollment.

The Columbus Board of Education chose the first alternative. It divided the old Mifflin district into two elementary attendance areas, one to the south for Cassady and one to the north for Innis. When Innis Road Elementary School opened for the 1975–76 school year, its student enrollment was 27.3% black. Cassady Elementary School during the same year had 89.3% black students.

During closing arguments, counsel for the Columbus Board of Education explained the Board's decision as follows:

> The Board based its decision on the fact that it at the time decided to maintain the K–6 organization throughout the district and that the pairing of these schools, given the geographical location of these two areas, would have required a substantial amount of transportation to effect a pairing situation.

The Columbus defendants' proposed findings of fact run in a similar vein:

> [T]he pairing of such schools would have required substantial transportation because of the large size of the combined areas. The Board voted not to pair the schools.
>
> . . . The alternative proposal would have required substantial transportation because of the greater distances involved. The Columbus Board was also justified in its decision to maintain the K–6 organization that now exists throughout the system with the exception of Colerain, which is a primary and crippled children center. Other primary centers are no longer in existence. Sixth Avenue has been closed. The K–3 primary center at Hudson, which was assigned to Hamilton, was recently eliminated with an addition. The school system has never had a K–3 primary center without a K–6 home school . . . .

These defendants' own proposed findings amply demonstrate that when in the past a diversion from the K–6 structure served interests, such as overcrowding and special educational concerns, which were considered important by the Board, the Columbus Board of Education did not hesitate to abandon the K–6 structure in favor of primary centers and intermediate schools.

The Court can find no evidence in this record supporting defendants' argument that pairing Innis and Cassady would have necessitated "substantial transportation" of students. Dr. Ellis testified that *both* alternatives "had some problem with the standpoint of distances and transportation and crossing highways . . . ."

It is truly ironic that Innis Road Elementary was the first school built with the $89.5 million raised when Columbus voters approved the November 7, 1972, bond issue. A $75.95 million bond issue had been defeated at the polls in 1969. Dr. John Ellis became Superintendent of the Columbus Public Schools in August, 1971. In November of that year he proposed Project UNITE, which is mentioned in Part A of this section of this opinion. On December

7, 1971, the Board of Education approved a resolution authorizing the implementation of the project. After a tremendous amount of community participation in the project, including nine public forums, the steering committee of Project UNITE presented its official report to the Board of Education on May 30, 1972. Thereafter, before the November balloting, the Board approved various aspects of the Project UNITE report. The approved proposals were in turn capsulized in a document styled "THE BOND ISSUE, 1972: PROMISES MADE," which was widely distributed in the community and was the subject of news media presentations.

At the June 27, 1972 meeting of the Columbus Board of Education, Superintendent Ellis noted that Project UNITE "spoke in many ways to the fact that we should consider the question of integration as a policy for the consideration of the Board." The following resolution was moved and seconded:

It shall be the goal of the Columbus Public Schools to make available integrated educational experiences for all students. Therefore, the Board of Education and administration shall reflect that goal in the enactment of policy and in administrative action.

Two of the three blacks on the seven-member Board spoke in favor of an amendment which would have replaced the words "to make available" with the words "to provide." Two white Board members spoke against the amendment, asserting that the "to provide" language connoted mandatory integration. The amendment was defeated on a 2–5 vote, and the original resolution passed on a 4–3 vote, the black members voting nay. Thereafter, at the same meeting, a resolution which would have placed the $89.5 million bond levy before the voters was moved and seconded. This motion required a two-thirds majority vote of the Board for passage. A similar levy had been defeated by the voters in 1969, and there was Board discussion about the severe need for school construction in the district. One

of the Board members then made the following statement:

So I would like to read this because the concern that I have had . . . as a Board member is that I have been appeased and put in position where I had to go along, and I think that my conscience won't allow me to go along with things that I think are wrong now and have been wrong for many, many years.

We have made several simple requests of this Board, and none of these were honored. And this is the essence today where we voted in the usual four-to-three manner.

I don't mind being voted down. I don't mind being wrong. But I certainly think that the world and the nation have pointed out repeatedly that some of the things that happened in Columbus are wrong. . . . We [black Board members] have been told that we should not deter the education of kids by voting against the bond issue because we need more, we need bricks, and I think that this is one thing that this Board is in agreement with. We do need more than bricks, but what goes on behind those walls is much more important to the lives of kids than the fact that we need buildings.

. . . . .

[T]he thing that we as a group ask, number one, [is] that this Board give a sincere statement to the effect that either segregated education is good or integrated education is good.

. . . . .

[I]t all goes back to the statement, this positive statement of accord, for what is the best possible education for boys and girls in Columbus, and how it can best be achieved. And since we can't come to that accord, we feel we would be forcing something on the public that they not only wouldn't want to vote for, but would vote down and for that reason I cannot support the bond issue.

The resolution concerning the bond levy did not pass at the June 27 meeting. Three

weeks later, at a July 18, 1972, meeting, the Board adopted the formal goal statement concerning integrated educational opportunities which is set out in Part III(A) of this opinion. At the same meeting, the Board voted unanimously to submit the bond levy to the voters.

The "Promises Made" pamphlet included a section styled "How Will This Bond Issue Enhance or Restrict the Process of Racial Integration?" The Board's July 18, 1972, formal goal statement was quoted. The Board's resolution included the statement, "The Superintendent of Schools shall implement this policy by the development of proposals for the approval of the Board of Education." "Promises Made" included the following statements (emphasis supplied):

> New buildings will be located whenever possible to favor integration. In such areas, school attendance area boundary lines *or organizational changes* will be made to improve the opportunity for schools to be integrated without resorting to unreasonable gerrymandering.

In a cover letter included with "Promises Made," Superintendent Ellis stated:

> It is vital that the Columbus Board of Education and school administration keep the promises they have made while promoting the school bond issue. Public faith in all public institutions appears to be low. One way to help rebuild good faith is to follow the principle that a promise made should be kept.

The Columbus voters approved the November 1972 bond levy by a 55.7% majority. When Innis Road Elementary was completed, Dr. Ellis complied with his duty under the Board's July 18, 1972, resolution, and he kept his bargain with the voters. He presented an educationally sound, integrative alternative to the Board concerning Innis and Cassady. Here, he in effect said, is an opportunity to use school attendance area boundary lines and organizational changes to improve integration of schools without resorting to unreasonable gerrymandering. The Columbus Board of Education refused the offer.

## IV. CONSTITUTIONAL QUESTIONS

### A. THE CONCEPT OF "INTENT"

Recognizing the enormous importance attendant to the Court's duty to correctly apply the law to the facts of this case, the parties have provided extensive arguments in efforts to persuade the Court toward their respective legal theories. The Court will first set forth a number of rather general legal propositions about which the parties apparently have little real disagreement.

In order to receive any remedial action from the Court, plaintiffs must show that their constitutional rights have been violated. In *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973), the Court phrased the requirement:

> [P]laintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action.

Therefore, regardless of the existing statistical racial imbalance of all or any of the Columbus schools, this Court cannot and should not issue any remedial order if there has not been shown a deprivation of a constitutional guarantee which caused the imbalance. See also *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Racial imbalance in a school system *solely* caused by discrimination in housing does not provide a basis for a Court to find that school authorities have violated constitutional rights. See *Deal v. Cincinnati Board of Education,* 369 F.2d 55 (6th Cir. 1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). Mere racial imbalance resulting from population shifts would not be enough to constitute unlawful segregation in the constitutional sense. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 23–24, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In *Keyes* the Supreme Court held that "where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is

only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system." 413 U.S. at 201, 93 S.Ct. at 2694. After the *Keyes* case was decided, the United States Court of Appeals for the Sixth Circuit set out the elements of proof involved in a school desegregation case. That Court stated:

> A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools.

*Oliver v. Kalamazoo Board of Education,* 508 F.2d 178, 182 (6th Cir. 1974) (footnote omitted), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

■ Particularizing these legal principles to the instant case, if plaintiffs have been able to prove purposeful or intentional acts or omissions by defendants which have caused a meaningful part of the Columbus school system to be unconstitutionally segregated, then defendants are under an obligation to show that racial imbalance in the other components of the system is not the result of their purposeful acts or omissions. See *Higgins v. Grand Rapids Board of Education,* 508 F.2d 779, 789 (6th Cir. 1974).

■ As I recall the briefs and oral arguments of the parties, the litigants recognize the obligation of plaintiffs to show certain intentional or purposeful acts or omissions of the defendants or their predecessors in office. Before turning to a discussion of the words "intent or purpose," it is helpful to confront the Columbus defendants' contention that the present Superintendent and Board members should not be deemed responsible for acts done by other persons who held those offices many years ago. Since these defendants are sued in their official capacities, the official acts of their predecessors are cognizable under certain circumstances. Obviously, if former segregative acts are later nullified or if the substantial impact of such acts or omissions has been attenuated by time or by changed social conditions to the extent that no substantial impact of the acts or omissions

remains to injure the plaintiffs, then they are of no significance. Mr. Justice Brennan wrote in *Keyes,* 413 U.S. at 210–211, 93 S.Ct. at 2698, as follows:

> The courts below attributed much significance to the fact that many of the Board's actions in the core city area antedated our decision in *Brown.* We reject any suggestion that remoteness in time has any relevance to the issue of intent. If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less "intentional."

The Court, then, may consider the actions and omissions of defendants' predecessors in office.

■ The concept of intent is often used as jargon in the legal litany, and has been the subject of much discussion by both courts and commentators. The intent or purpose requirement is extremely important in this case, and must be clearly resolved by the Court. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* —— U.S. ——, ——, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

The intent contemplated as necessary proof can best be described as it is usually described—intent embodies the expectations that are the natural and probable consequences of one's act or failure to act. That is, the law presumes that one intends the natural and probable consequences of one's actions or inactions. In order for an act to be intentional, it need not only be expected to visit harm or ill will on others. Some intentional acts obviously are designed to produce a harmful result; other such acts are not so designed.

In their post-trial reply brief, the intervening plaintiffs devote a number of pages to a discussion of the concept of intent. These plaintiffs evidently read the Columbus defendants to be arguing in their brief that racial animus (malevolent discrimina-

tory purpose) is the intent standard to be applied in cases such as this. At closing arguments, counsel for the Columbus defendants set the record straight:

Plaintiffs in their reply brief argue that the Columbus Board was taking the position that to find liability, the Court would have to find that individual school board members were motivated by racial animus or malice or intended to do actual harm to black students. We do not take that position. That position was not taken in our brief.

We think that a finding of liability requires more than mere proof of racial imbalance or proof of actions taken that did not have the effect of eradicating racial imbalance. We think that the way that the plaintiffs urged the foreseeability test, if you will, is that any action taken which did not bring about some type of racial balance, whether on a percentage based on a percentage-wide system, mean time percentage or a plus or minus type system, that any action taken which did not cause that somehow permits an inference of segregative intent. We think from the plaintiffs' arguments and proofs that what they are really urging this Court to find is that this system is unconstitutional because every one of the 170 schools or every one of the 100 schools they built since 1950 did not open with the roughly equivalent racial balance. In so doing, plaintiffs urge the Court to infer segregative purpose then from proof of acts, regardless of whether those acts were justified by educational concerns. We think that there is more to the test of intent than simply whether it was foreseeable that that action would in and of itself cause racial imbalance.

Now, if I can for a minute, I would like to turn to a couple of Sixth Circuit cases, mainly *Bronson* [*v. Board of Education of the City School District of Cincinnati*, 525 F.2d 344 (1975), *cert. denied*, 425 U.S. 934 [96 S.Ct. 1665, 48 L.Ed.2d 175] (1976)]. The *Higgins* case is clear, I think, that intent does not mean malice. I don't know how the plaintiffs got that point from our brief. I don't see it there, and I think maybe they—I don't know, but maybe they wanted to make that argument so they could talk about this today. I am not sure.

The parties apparently do not disagree so much about the law as they do about its application to the facts of the case.

My review of the law convinces me that the plaintiffs need not prove that the defendants intended to do harm, or acted with ill will.[3] They need only prove that school

---

**3.** The discussion of this problem in *Hart v. Community School Board*, 512 F.2d 37, 48 (2d Cir. 1975) is helpful. That court focused on the issue by making an assumption: "We assume that mere inaction, without any affirmative action by school authorities, allowing a racially imbalanced school [or school system] to continue, would amount only to *de facto* rather than *de jure* segregation. Since here there has been a finding of affirmative action, coupled with intentional inaction, the case is different." The *Hart* court then stated:

We conclude that enough has been shown of intentional state action through the community school board and its predecessor local school board to support a finding of segregative intent from the foreseeable consequences of action taken, coupled with inaction in the face of tendered choices. Instead of remanding, we treat the District Court's finding of a lack of racial motivation as irrelevant in the face of his findings of foreseeable effect.

*Hart v. Community School Board*, 512 F.2d 37, 51 (2d Cir. 1975) (footnote omitted).

The defendants refer the Court to decisions of the United States Court of Appeals for the Ninth Circuit which may be read to require proof of desire to discriminate as a necessary predicate for a finding of unconstitutionality. In *Soria v. Oxnard School District Board of Trustees*, 488 F.2d 579, 585 (9th Cir. 1973), *cert. denied* 416 U.S. 951, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1975), the Ninth Circuit read *Keyes* to require a "determination that the school authorities had intentionally discriminated against minority students by practicing a deliberate policy of racial segregation." The Ninth Circuit re-affirmed this reading in *Johnson v. San Francisco Unified School District*, 500 F.2d 349, 351 (9th Cir. 1974). In *Soria*, the Ninth Circuit sent the case back to the trial court for a determination of whether segregative intent should be inferred. 488 F.2d at 588. It did the same thing in *Johnson*, 500 F.2d at 352. A district court in the Ninth Circuit recently summarized the posture of the law in that circuit as follows:

Thus, under the Ninth Circuit formulation of the standard for unconstitutional *de jure*

officials intended to segregate. It is well within reason to believe that a person may intend to segregate or cause apartness for socially admirable reasons. It can be argued that many genuinely believed, perhaps some yet believe, that it is best to educate children with other children, administrators and faculty of their own race. Some may believe in complete sincerity that the total community good will be enhanced by segregation. As Mr. Justice Stewart wrote when he was a Circuit Judge in the case *Clemons v. Board of Education of Hillsboro*, 228 F.2d 853, 859 (6th Cir. 1956) (concurring opinion):

> The Board's subjective purpose was no doubt, and understandably, to reflect the "spirit of the community" and avoid "racial problems," as testified by the Superintendent of Schools. But the law of Ohio and the Constitution of the United States simply left no room for the Board's action, whatever [subjective] motives the Board may have had.

Intentional segregation of black school children by public officials is unconstitutional whether caused by those truly caring about blacks or those calloused to their concerns.

■ Perhaps one of the questions in this case can be posed in this fashion: If a board of education assigns students to schools near their homes pursuant to a neighbor-

hood school policy, and does so with full knowledge of segregated housing patterns and with full understanding of the foreseeable racial effects of its actions, is such an assignment policy a factor which may be considered by a court in determining whether segregative intent exists? A *majority* of the United States Supreme Court has not directly answered this question regarding non-racially motivated inaction. On the other hand, the United States Court of Appeals for the Sixth Circuit has addressed the question as follows:

> It is thus seen that the law imposes no affirmative duty upon school officials to correct the effects of segregation resulting from factors over which they have no control. Neither are they operating a dual system when they fail accurately to anticipate the full effect of their racially neutral retention of a neighborhood school system, absent a finding of segregative intent.
>
> . . . . .
>
> . . . While it is true that a court may *infer* such an intent from the circumstances there is no authority for the proposition that such an intent *must* be inferred in all cases where segregated patterns exist in fact. The inference is permissible, not mandatory.

---

segregation, the school board is precluded only from practicing a purposeful policy of racial separation in the school system; the district is under no affirmative duty to improve racial balance in the schools. However, where the school board claims that actions which perpetuated racial imbalance were motivated by proper educational concerns, it is the function of the trial court to scrutinize closely the school board decision-making process to assure that false or facile justifications do not mask purposeful discrimination.

*Diaz v. San Jose Unified School District*, 412 F.Supp. 310, 330 (N.D.Cal.1976).

The difference, if any, between the Second Circuit's approach to the standard of liability and that of the Ninth Circuit appears to be that the Second Circuit would affirm a finding of liability based upon proof of affirmative intentional acts and omissions after notice which foreseeably result in segregation even in the absence of desire to segregate. The Ninth Circuit would appear to require proof of a deliberate policy of segregation, but would permit this

requirement to be met by the drawing of reasonable inferences from evidence of defendants' intentional acts and omissions.

The *Hart* court describes its differences from the Ninth Circuit decisions as largely semantic. I believe it is somewhat more than semantic, but, in any event, the law of the Sixth Circuit is applicable in the case at bar.

In *Oliver v. Michigan State Board of Education*, 508 F.2d 178, 182 (6th Cir. 1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the Sixth Circuit held:

> A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies.

See also *Higgins v. Board of Education of City of Grand Rapids*, 508 F.2d 779 at 791, 793 (6th Cir. 1974).

*Higgins v. Board of Education of City of Grand Rapids*, 508 F.2d at 791, 793 (emphasis in original).

I do not read the Sixth Circuit cases as holding that *Keyes* forbids the foreseeable effects standard from being utilized as one of the several kinds of proofs from which an inference of segregative intent may be properly drawn. A standard requiring plaintiffs in a school desegregation case to adduce *direct* proof of a "racial motive" on the part of a multi-person school board would border on the impossible. There is nothing new or unique about drawing reasonable inferences from facts found, even when essential elements of proof are supplied from inferences drawn.

Applying the *Higgins* standard, I believe that the question posed above should be answered in the affirmative. Substantial adherence to the neighborhood school concept with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.

## B. DRAWING THE INFERENCE OF SEGREGATIVE INTENT

The Columbus defendants argue that the official acts of the Columbus Board of Education have in recent history been racially neutral. They contend that the Board has acted in conformity with the neighborhood school philosophy, and that the racial imbalance which admittedly exists in the Columbus Public Schools is the sole result of housing segregation and other factors which are beyond the control of school officials. If the Columbus Public Schools were ever unlawfully segregated, say these defendants, then intervening decades of racially neutral Board policies, and certain recent efforts of the Board and of school administrators, have completely cleansed the school district of any present and continuing effects traceable to past illegalities.

Plaintiffs argue to the contrary. They direct the Court's attention to a series of Board actions, both remote and recent, which they contend are inexplicable except by reference to segregative intent. They assert that during this century the Columbus defendants and their predecessors in office have repeatedly engaged in purposeful and overt segregative acts. Against this background, they attack the Board's adherence to the neighborhood school philosophy, arguing that such adherence was not racially neutral in light of all the evidence adduced at trial. They insist that on this record it is entirely reasonable to infer segregative intent.

### Notice to the Board

If there exists in this case a factor which distinguishes it from some other northern desegregation cases, it is the proof adduced concerning notice to the Columbus Board of Education. Various segments of the community, notably black parents and civic organizations, have repeatedly and articulately vocalized concern, anger or dismay concerning both overtly segregative actions and lost integrative opportunities.

As mentioned hereinabove, even before the turn of the century black citizens complained about the plight of black students in Columbus. In 1909, Charles W. Smith took the Columbus Board to court in a futile effort to secure equal rights for black school children. Since the 1954 *Brown* decision, the Columbus defendants or their predecessors were adequately put on notice of the fact that action was required to correct and to prevent the increase in racial imbalance. The local NAACP group, Columbus Urban League, Columbus Metropolitan League of Women Voters, Columbus Area Civil Rights Council, Columbus Metropolitan Council on Quality Integrated Education, the Columbus Board-sponsored Ohio State University Advisory Commission on Problems Facing the Columbus Public Schools, and officials of the Ohio State Board of Education all called attention to the problem and made certain curative recommendations. An assistant state superintendent for public instruction testified in part:

Q. Mr. Greer, did you or your staff ever recommend that the Columbus administration employ various integrative techniques?

A. Yes, sir.

Q. Like what?

A. Well, in several of the sessions, early sessions, the question came up—this question came up: Is it possible or would it be possible for Columbus City to use any of the eleven or twelve different techniques that are available in the Department of Health, Education and Welfare handbook, pairing of schools, magnet schools, changing of boundary lines and so on, of the different kinds of procedures normally used in all these desegregation efforts, and we made recommendations based on, well, at least five or six of the different methods that seemed to be feasible for this city.

You may begin by moving certain boundaries just a half mile or two blocks in some cases in any number of cities to make change.

Others, you would have to use other methods such as pairing.

In some sections of the city, it might have required setting up magnets.

We even discussed the business of open enrollment and how much impact it would have when you combined it with all the other types of methods, yes.

The Ohio State University Advisory Commission on Problems Facing the Columbus Public Schools was appointed by Ohio State University President Novice G. Fawcett at the request of the Columbus Board of Education. The Commission was asked to clarify some of the problems facing the schools and to offer recommendations which would help solve them. In a report dated June 15, 1968, the Commission concluded that there were racially segregated schools in Columbus. The Commission recommended:

A fundamental barrier to the achievement of racial integration has been the construction of new housing, high rise, multiple and single dwelling, public and private, that is in effect segregated when it opens. New segregations crop up faster than the schools can achieve integration no matter how hard they try. The Commission recommends, therefore, that the Board of Education take immediate steps to place all plans for new school construction or additions to existing facilities under pre-construction open housing agreements hammered out in advance.

. . . . .

If such a policy were in effect in Ohio, it would: (1) encourage orderly development of open housing; (2) permit the interests of the business, industrial, and economic sectors of the community to combine with the civil rights interests in a forthright, genuine and highly creative set of policies to achieve outstanding educational as well as other urban improvements; (3) stand against the tendencies to resegregate which are so prominent in most metropolitan areas; (4) make less necessary large-scale transportation programs to achieve equal educational opportunity; (5) prevent the occurrence of new segregations which often take place when new schools are opened; (6) fit with other attempts to desegregate schools where de facto segregation now exists in Columbus; (7) permit the Board of Education to concentrate on segregated sections of the community allowing it to work out a managed integration policy for those parts of the city; and (8) set an immediate example of compliance with recent federal legislation on open housing.

. . . . .

The mobility of both the black and white populations in many sections of the city will undoubtedly continue for a period of years—at least until genuine open housing is achieved in the metropolitan area. During the era of rapid population movement, the school system must pursue deliberate integration practices.

From a careful review of the facts, I believe it fair to say that the Columbus defendants' response to notice of the racial imbalance problem and to a mass of advice about alternatives has been minimal. In

1968, after receiving the Ohio State University Advisory Commission report, the Columbus Board developed an Urban Education Coalition, initiated a series of neighborhood seminars, and went on record stating that efforts would be accelerated to achieve better racial distribution in the attendance areas of the Columbus Public Schools, to exploit opportunities for interracial educational experiences involving pupils in suburban districts with Columbus pupils, to plan new approaches to integrated education, to encourage teachers to develop wholesome feelings toward minority group children, to understand more fully the problems of such children, and to recruit black teachers, supervisors and administrators. Notably absent was any *action* to adopt the more substantive areas of the Commission's recommendations as set forth above.

As is noted earlier in this opinion, a resolution, defeated by a majority of the Board would have created a site selection advisory board designed to provide a mechanism for preventing the selection of construction sites which would result in racially segregated schools. In 1973 a motion that the Columbus Board of Education formally request the State Department of Education to develop and present to the Columbus Board plans for effectively desegregating the Columbus Public Schools was defeated. Also, the Board declined to apply for federal funds for desegregation.

Defendant Dr. John Ellis, Superintendent of Columbus Schools, stated in regard to methods used for education of black and white children:

Q. What steps are you taking to achieve that in Columbus?

A. The major effort that we have taken I would characterize as two-fold. First, through the school building program, we have added a variety of career centers that are open and available to students from across the school district. At the elementary and junior high school level, we have designated schools as developmental learning centers that are open to children beyond the neighborhood district. We are also offering different alternative schools such as an informal school, a traditional school, an IGE school, a positive reenforcement school, all schools that will have students from across the entire school system. So one thrust is to insure that we have a wide diversity of educational programs that will appeal to the great needs of a metropolitan area.

The second part of our approach, and all of this I assume could be embraced under the label "Columbus Plan," is to insure that pupils know about the opportunities and that a transportation network is created so that the opportunities are not merely ephemeral but can become actual.

The action of the Columbus Board was described at trial by its then-president: "[W]e are putting all our cards, if you will, on the Columbus Plan because it is a positive plan and because people seem to accept it." Another member of the Board opined that she does not believe in desegregation, does not view the Columbus Plan as a desegregation plan, but does believe in voluntary integration.

### Neighborhood School Concept

Educators, state officials, parents and children all may derive benefits from a neighborhood school policy. While it is not the only available policy, the Court recognizes its worth. Savings in time and money may result from the policy.

Chief Judge Battisti has remarked as follows concerning the neighborhood school concept:

Of all the issues raised at trial, perhaps none engendered as much discussion as the local school board's purported "neighborhood school policy." At various times, such policy was both a sword and a shield. The plaintiffs wielded it as an offensive weapon and viewed the board's application of the neighborhood school policy as clear evidence of its segregative intent. The board, on the other hand, cloaked itself in the neighborhood school policy viewing such policy not only as a viable defense, but also one mandated by law.

*Reed v. Rhodes,* 422 F.Supp. 708, 790 (N.D. Ohio 1976).

■ Many of life's difficult decisions, surely many decisions of this Court, require that priorities be established among known social pluses. This is such a case. The protection of constitutional rights of those who litigate here is this Court's most important function. A neighborhood school policy, revered by many as it is, cannot be a contributor to unconstitutional deprivation. Those who rely on it as a defense to unlawful school segregation fail to recognize the high priority of the constitutional right involved. The Chief Justice of the United States, writing for a unanimous Supreme Court, has stated in this regard:

> Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation.

*Swann,* 402 U.S. at 28, 91 S.Ct. at 1282.

At trial the Court did not hear any evidence disputing the value of providing an integrated education. The Court is mindful that many citizens and educators sincerely dissent from the law that favors the non-segregated education of our children. Many believe that court remedies designed to foster integrated education are not educationally worth their trouble. This Court need not enter this popular debate. The existing applicable law, as I understand it, will be applied; nothing more, nothing less.

### Residential Segregation

■ In *Austin Independent School Dist. v. United States,* —— U.S. ——, ——, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976), Mr. Justice Powell, speaking in a concurring opinion for himself and two other justices, stated:

> The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private—cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns.

The conclusions I draw from the facts of the instant case are somewhat congruent with that general statement. Counsel for the defendants have objected to testimony of racial residential segregation; however, the evidence, in my view, is relevant, and it has been considered.

Intervening plaintiffs' expert witness Dr. Karl Taeuber, a University of Wisconsin professor of sociology with outstanding qualifications, testified concerning a summary statistical index of the degree of black-white racial segregation. The index is a scale that goes from 0 to 100. Zero represents a situation of no residential segregation by race. No segregation means that in the census data that every single city block would have the same percentage of white and blacks as the city ratio of black to white households. For example, if there are 20% blacks in the city, then every block would have 20% black and 80% white. That would be zero residential segregation. If every block were completely occupied by blacks or completely occupied by whites, that would be complete segregation; the index value would be 100. Based on census data in evidence, Dr. Taeuber evaluated Columbus in certain census years as follows:

| Year | Index |
|------|-------|
| 1940 | 87.1 |
| 1950 | 88.9 |
| 1960 | 85.3 |
| 1970 | 84.1 |

Dr. Taeuber concluded that blacks who have economic alternatives available seek to avoid living in a 100% black area, but that their choices are constrained because in reality there is a dual housing market; one for blacks and another for whites.

Housing segregation has been caused in part by federal agencies which deal with financing of housing, local housing authorities, financing institutions, developers, landlords, personal preferences of blacks and whites, real estate brokers and salespersons, restrictive covenants, zoning and annexation, and income of blacks as compared to whites.

■ The Court finds that in Columbus, like many other urban areas, there is often a substantial reciprocal effect between the color of the school and the color of the neighborhood it serves. The racial composition of a neighborhood tends to influence the racial identity of a school as white or black. This identification comes in the form of student, teacher, and administrative assignments as well as the location and attendance boundaries of the school. When the number of black pupils increases, the number of black teachers increases, and a black principal is assigned; the school then becomes less attractive for white students to attend. The racial identification of the school in turn tends to maintain the neighborhood's racial identity, or even promote it by hastening the movement in a racial transition area. White families tend to cease migrating into such a neighborhood, and tend to move out of the area.

The Court has received considerable evidence that the nature of the schools is an important consideration in real estate transactions, and the Court finds that the defendants were aware of this fact. The defendants argue, and the Court finds that the school authorities do not *control* the housing segregation in Columbus, but the Court also finds that the actions of the school authorities have had a significant impact upon the housing patterns. The interaction of housing and the schools operates to promote segregation in each. It is not now possible to isolate these factors and draw a picture of what Columbus schools or housing would have looked like today without the other's influence. I do not believe that such an attempt is required.

I do not suggest that any reasonable action by the school authorities could have fully cured the evils of residential segregation. The Court could not and would not impose such a duty upon the defendants. I do believe, however, that the Columbus defendants could and should have acted to break the segregative snowball created by their interaction with housing. That is, they could and should have acted with an integrative rather than a segregative influence upon housing; they could and should have been cautious concerning the segregation influences that are exerted upon the schools by housing. They certainly should not have aggravated racial imbalance in the schools by their official actions.

### Recent Efforts

■ The Court is impressed with the positive efforts of the Columbus defendants to provide a number of innovative educational alternatives. Columbus in the near future will have programs of vocational, alternative and special education which will compare favorably with any system in the country. The new Fort Hayes training center presents an opportunity for education which certainly will provide students with more and different marketable skills. Participation in the Columbus Plan nears 4,000 students, and full transportation is now provided. The Columbus defendants forecast, and the Court agrees, that substantial numbers of students will participate in these programs in the years to come.

However, no witness testified, no exhibits show, and I am unable to find that the sum of the new programs has any probability of substantially curing the system's racial imbalance, which the Court finds directly resulted from defendants' intentional segregative acts and omissions. Increased numbers of majority white schools have black administrators employed. However, 70% of all black principals were assigned to identifiably black schools at the time of trial.

The number of black teachers in each school almost compares to the ratio of black to white teachers in the total system. Suffice it to say that this has occurred only after the Ohio Civil Rights Commission's complaint and the consummation of a con-

sent order before that Commission. Moreover, the Court cannot find, as plaintiffs urge, that the Columbus defendants have failed to comply with the consent order and have downgraded efforts to recruit black faculty and administrators. The effort to comply with the consent order appears to be substantially successful; also, the effort to recruit black teachers appears to have been sincere and reasonable.

The recent efforts of the Columbus defendants are in many ways highly commendable, but fall far short of providing the Court a basis to find that the defendants are solving the constitutional problems the evidence reveals.

For example, there is little dispute that Champion, Felton, Mt. Vernon, Pilgrim and Garfield were de jure segregated by direct acts of the Columbus defendants' predecessors. They were almost completely segregated in 1954, 1964, 1974 and today.[4] Nothing has occurred to substantially alleviate that continuity of discrimination of thousands of black students over the intervening decades. Neither the magnet alternative school nor the Columbus Plan will predictably provide students at those schools their constitutional rights.

### Burden of Proof

As mentioned hereinabove, the *Keyes* court provided for a shift in the burden of proof when plaintiffs' proofs reach a certain standard. A defendant must then assume the obligation to show that the constitutional right to equal protection has not been denied to plaintiffs. *Keyes, supra,* 413 U.S. at 208, 93 S.Ct. 2686.

In the instant case I have found that a number of schools on the near-east side of Columbus—Felton, Champion, Garfield and Pilgrim—were deliberately segregated or racially imbalanced by acts of school officials. During the intervening years the imbalance has survived unattenuated by any acts of defendants. Years of the practice of racial considerations in the assignment of

teachers and administrators have negatively influenced the racial character of the schools. Recent acts have lessened the sting of the practice, but have not served to substantially remove the evil it helped create. Again, recent concern in this regard is too little and too late to abate the need for a remedy.

Defendants' evidence falls short of showing that the racial character of the school system is the result of racially neutral social dynamics or the result of acts of others for which defendants owe no responsibility. Defendants have not proved that the present admitted racial imbalance in the Columbus Public Schools would have occurred even in the absence of their segregative acts and omissions, see *Mt. Healthy City School District Board of Education v. Doyle,* —— U.S. ——, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

### Finding of Segregative Intent

From the evidence adduced at trial, the Court has found earlier in this opinion that the Columbus Public Schools were openly and intentionally segregated on the basis of race when *Brown I* was decided in 1954. The Court has found that the Columbus Board of Education never actively set out to dismantle this dual system. The Court has found that until legal action was initiated by the Columbus Area Civil Rights Council, the Columbus Board did not assign teachers and administrators to Columbus schools at random, without regard for the racial composition of the student enrollment at those schools. The Columbus Board even in very recent times, has approved optional attendance zones, discontiguous attendance areas and boundary changes which have maintained and enhanced racial imbalance in the Columbus Public Schools. The Board, even in very recent times and after promising to do otherwise, has adjured workable suggestions for improving the racial balance of city schools.

---

4. Felton Elementary School was closed in 1974. At that time, it was a racially identifiable black school.

Viewed in the context of segregative optional attendance zones, segregative faculty and administrative hiring and assignments, and the other such actions and decisions of the Columbus Board of Education in recent and remote history, it is fair and reasonable to draw an inference of segregative intent from the Board's actions and omissions discussed in this opinion.

### Higgins v. Board of Education of City of Grand Rapids

All parties cite the *Higgins* case, 508 F.2d 779 (6th Cir. 1974). The Sixth Circuit affirmed the well-written trial court decision, which found in part for the defendant Grand Rapids Board of Education. It may be worthwhile to compare some of the *Higgins* facts to the facts of our Columbus case. Like Columbus, there were many schools racially imbalanced in Grand Rapids. All of the high schools, however, had been racially balanced. Following a master plan adopted by the school board, Grand Rapids made substantial improvement in racial balance when, in attempting to relieve overcrowding of the innercity schools, the conscious decision was made to use integrative feeder patterns to outlying schools. In Grand Rapids, few new schools opened racially identifiable, while in Columbus many new schools have opened racially identifiable in recent years.

The trial court in *Higgins* did not find that a substantial part of the Grand Rapids school district was officially segregated either before or after the *Brown I* decision. The plaintiffs adduced no proof of intact busing in Grand Rapids. Plaintiffs challenged only "a few instances" of boundary line and feeder pattern changes, and the Court of Appeals held that these proofs "were properly dismissed by the district court as too isolated to support charges of gerrymandering to achieve forbidden racial discrimination." 508 F.2d at 786. Plaintiffs considered only one optional zone created by the Grand Rapids Board of Education to be "significant," 395 F.Supp. at 459, and as to this zone the trial court held that "the criteria of the school administration in

granting the option and in considering attaching the area to the Creston zone were at least completely neutral and . . . there is no credible evidence to support a rational inference of racial overtones or bias in the decision." 395 F.Supp. at 472.

In finding in part for plaintiffs, the United States District Court for the Western District of Michigan noted that up until 1970 most black faculty in Grand Rapids were assigned to predominantly black schools; like Columbus, this condition had improved in recent years in Grand Rapids. Nevertheless, the trial court determined that the practices of the board regarding faculty assignment had violated the rights of plaintiffs under the Equal Protection Clause, and ordered relief concerning these assignments. 395 F.Supp. at 484 and 490.

In affirming, the Sixth Circuit stated:

Another relevant factor to be considered in assessing the finding below that segregation in the Grand Rapids school system is not the result of intentional acts by the school board, is the testimony of the plaintiffs' own witness that many of the more commonly used or classic segregative techniques found in other cases were absent in Grand Rapids. These devices included intact bussing, bussing blacks past white schools having extra capacity to more distant black schools, widespread use of optional attendance zones, use of multiple and overlapping attendance zones, disparity between physical quality of black and white schools, constant gerrymandering of attendance zones, and discriminatory use of transfer policies.

*Higgins v. Board of Education of Grand Rapids,* 508 F.2d 779, 787 (1974). In contrast, many of these "classic segregative techniques" have been used in Columbus.

### C. THE STATE DEFENDANTS

#### Governor and Attorney General

 These state officers are defendants in this case. The facts do not show either officer did anything, or failed to do anything that he was obligated to do, which

caused plaintiffs the harm for which they seek redress.

### State Board of Education and Superintendent of Public Instruction

█ The Ohio Constitution clearly places the responsibility for public education upon the State of Ohio. Because local school boards initiate school levies for local voters' consideration, expend funds locally, and generally exercise administrative control over local schools, many people may well believe that such local boards of education have primary responsibility for the maintenance and operation of the public schools in Ohio. In fact, the state remains primarily responsible. This mandate has been our law since the adoption of the 1851 Ohio Constitution.[5]

The Sixth Circuit has commented on the obligation of the state administrative agency as follows:

Since an Ohio Attorney General's opinion dated July 9, 1956, the State Department of Education has known that it has an affirmative duty under both Ohio and federal law to take all actions necessary, including, but not limited to, the withholding of state and federal funds, to prevent and eliminate racial segregation in the public schools.

*Brinkman v. Gilligan,* 503 F.2d 684, 704 (6th Cir. 1974).

█ At no time have these state defendants *actively* moved to do anything to correct the racial imbalance in the Columbus schools. Nor did they act to make a determination as to whether black children were being deprived of their rights. The State Board and Superintendent assure that such matters as teacher qualifications, school building standards, curriculum requirements and annexations are lawfully administered. See R.C. 3301.07. The Court is of the opinion that the law of Ohio requires that the State Board of Education act to assure that school children in the various local school districts enjoy the full range of constitutional rights. The Board has not done this in Columbus even though it has received sufficient statistical evidence of student and faculty racial imbalance and is well aware of the existence of racially imbalanced schools in Columbus.[6]

---

5. Ohio Const. art. I, § 7; art. II, § 26; art. VI, § 2 (1851). Ohio Const. art. VI, § 3 (1912).

6. Counsel for the State Board of Education argued as follows during closing arguments:
 I am not pleading ignorance.

 . . . . .

 I am saying to the Court that the State Board has constructive knowledge of everything that is reported to the State Department of Education about the racial makeup of pupils and staff in the schools of Columbus. It has constructive knowledge. It is bound by that knowledge.
 Now, it is not so much a matter of investigation, Your Honor. It is a question of whether or not, knowing that, the State Board and Department should have told Columbus to make certain specific changes, and if Columbus refused to change, should the State Board and Department have threatened to withhold funds? Now, before they can do that, they have to have some reasonable basis to believe what they have constructive knowledge of is a violation of law.

 . . . . .

 [W]hen we look at the recommendations that have been made to Columbus [by the State Board], all of this is a panoply of activity that has desegregation as its objective. Now, the plaintiffs claim that the State Board is totally uninterested in desegregation, that it has a policy of maintaining segregation, but I say that this is absurd and does not stand up under the evidence in this record.
 The final question, a quasi question, is whether the State Board and Department could have done more. Could they have gone to Columbus and could they have demanded that certain things take place? Sure. We can all do more, but that is not the decisive legal issue. The question is not whether the State Board could have done more. The question is whether the State Board of Education had a policy of maintaining segregation, because that is what the majority of the *Keyes* decision talks about. Did it have segregative intent? The assessment of that question is important to the trier of facts.
 . . . [T]he explanation for the State Board's failure to demand that Columbus take certain specific acts and corrective action is not due to a policy of maintaining segregation. It is due, instead, to the State Board's belief that the Columbus Board has certain powers that are given to it by the statutes of Ohio and that the Columbus Board and its Superintendent must be allowed to exercise those powers except where

The State Board and the State Superintendent are Ohio's resident experts on school desegregation matters. They have the means to collect information, which they have done, to conduct hearings, to make findings, and to enforce orders based on their findings.[7] In 1956 the Attorney General of Ohio advised that the State Board had the primary responsibility for administering the laws relating to the distribution of state and federal funds to local school districts and that such funds should not be distributed, absent good and sufficient reasons, to local districts which segregated pupils on the basis of race in violation of *Brown I*.[8] The facts of this case offer no satisfactory reason for these state officials' failure to perform their duties as advised by the Attorney General. Mere "suggestions" to the Columbus Board were not enough. These defendants cannot be heard to say that they could not understand their obligations; the Attorney General made those clear.

Dr. Kenneth Connell, representing the Columbus Area Civil Rights Council, visited the offices of the state defendants in the spring of 1971 and requested that action be taken regarding the Columbus schools. No action was taken. As I understand the state defendants' argument, they claim that they would have investigated had Columbus school officials so requested. This position borders on the preposterous. It cannot reasonably be expected that those who violate the constitution will be anxious for an investigation in order that a remedy may be leveled against them.

The sheer multitude of appellate court decisions cited by the parties arising from school segregation cases all over this country from 1954 until this case was at issue, coupled with notice of the racial imbalance in the Columbus schools, would have led even the most socially optimistic to suspect that Ohio' second largest city might have some problem in that regard which required attention.

The state defendants are to be commended on the accumulation of data, advisory resumes and personnel to be used for desegregation. Dr. Robert Greer has worked long and hard in a leadership role in finding avenues designed to lead to equal educational opportunities. Information was provided to local districts, and rather gentle persuasion employed to encourage desegregation. But some firm action is needed when the horse won't drink the water.

 The failure of these state defendants to act, with full knowledge of the results of such failure, provides a factual basis for the inference that they intended to accept the Columbus defendants' acts, and thus shared their intent to segregate in

---

the exercise is in plain violation of the law. It had reason to believe that the Columbus Board was not in violation of the law, and that is the reason that it didn't demand the things that it demanded in Middletown, the things that it demanded in Toledo, the things that it demanded in North College Hill.

The State Board and the Department do not have a policy of maintaining segregation in the State of Ohio. They could do more, but they don't have a policy of maintaining segregation in this state, and their failure to do more is not the product of a segregative or segregationist state of mind.

7. R.C. 3301.16 provides that the Board shall revoke the charter of any school district which fails to meet the minimum standards. The Board may then dissolve the district and transfer its territory to one or more adjacent districts.

The State of Ohio provides financial assistance through the School Foundation Program to all qualifying, chartered districts in the state. The funds are provided by the legislature and are allocated by the Department of Education among the districts in accordance with the provisions of R.C. 3317.01 *et seq.* The Board disburses substantial federal funds to districts which qualify under different federal programs. Before a district may receive any federal funds, it must submit assurances that it is in compliance with law.

8. The Attorney General opined:

Following a' determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established to the satisfaction of each board, order a distribution of funds . . . ..

violation of a constitutional duty to do otherwise.

## V. CONCLUSION

As is not uncommon in complex cases such as this one, the Court in a pretrial decision ordered that the trial of this case be bifurcated, or split into two parts. The first part of the trial, concerning whether the Columbus Public Schools are in fact unlawfully segregated, is now over, and the proceeding portions of this opinion are intended to resolve the question of liability in accordance with the evidence and the applicable law. The Court is certifying today's decision for immediate interlocutory appeal. This action should permit any party who is aggrieved by the decision to contest it where the law permits it to be contested, in the United States Court of Appeals for the Sixth Circuit. Whether or not such an appeal is filed, it is now incumbent upon the Court and upon the parties to this lawsuit to proceed apace to the second stage of this proceeding, the remedy phase. In this kind of a case, it is common for the trial court, if liability on the part of the defendants has been proved, to require the defendant school boards to submit proposed plans directed toward the implementation of a remedy. *See, e. g., Brown v. Board of Education (Brown II),* 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); *Evans v. Buchanan,* 393 F.Supp. 428, 447 (D.Del.1975); *Morgan v. Hennigan,* 379 F.Supp. 410, 484 (D.Mass.1974); *United States v. Board of School Commissioners of the City of Indianapolis,* 332 F.Supp. 655, 681 (S.D.Ind.1971).

A school desegregation case such as the present one gives a trial court pause for a number of reasons. The evidence in this case harkens back to a previous era in the history of Columbus: a time fresh in the memory of some who testified at trial, when black parents and their children were openly and without pretense denied equality before the law and before their fellow citizens. This case is even more disturbing because it demonstrates the existence of substantial continuing effects of decisions made and actions taken during this bygone era upon the modern Columbus school system. And, since the days when Columbus and the Columbus Public Schools were openly segregated on the basis of race, those public officials charged by law with the administration of the Columbus Public Schools have for the most part ignored repeated requests and demands for an integrated educational system. They have engaged in overt actions which readily permit an inference of segregative intent. They have repeatedly failed to seize opportunities, large and small, which would have promoted racial balance in the Columbus Public Schools.

A case such as this one is also disturbing because of the social costs which can be associated with the implementation of a remedy. Depending upon the school system involved, these social costs can include substantial expenditures of public funds, inconvenience and hardship for students, unrest on the part of various segments of the community involved, and flight by white residents from the desegregated school district, often resulting in more pronounced racial imbalance and in a loss of tax base. While the plaintiffs must, and will, receive vindication for the deprivation of their constitutional rights, the social costs should not be forgotten in the formulation of a remedy.

No federal trial court has a free hand in determining the scope and terms of a remedy to be applied in a school desegregation case. Far from it. The federal appellate courts, including the Supreme Court of the United States, have since *Brown I* produced scores of school desegregation decisions, including decisions concerning the proper remedy to be applied in such cases. The ongoing litigation concerning the Dayton, Ohio, public schools is a case in point. On February 7, 1973, after an evidentiary hearing, an extremely able and concerned district judge in Dayton filed an opinion which determined that the Dayton Public Schools were unlawfully segregated. On July 13, 1973, after considering three separate desegregation plans submitted to it, the district court essentially accepted a plan sub-

mitted by the majority of the Dayton Board of Education. The plan provided for no transportation of students, and placed minimal reliance upon so-called magnet schools. The plan did include the elimination of all optional attendance zones, the revision of a voluntary student transfer program, and the creation of racially balanced faculty and staff for the Dayton schools.

On appeal, the United States Court of Appeals for the Sixth Circuit agreed with the district court's decision concerning liability, but disagreed with the remedy which it had ordered. Without mentioning transportation of students, the Court of Appeals held that "the remedy ordered by the District Court is inadequate, considering the scope of the cumulative violations." *Brinkman v. Gilligan*, 503 F.2d 684, 704 (6th Cir. 1974). The case went before the district court again. That court ordered the closing of an all-black high school, the creation of numerous magnet schools, and the continuation of the voluntary student transfer program, but declined to order transportation of students. The case was again appealed to the United States Court of Appeals for the Sixth Circuit, which did not find the remedy plan ordered by the trial court to be acceptable. The Court of Appeals stated, *Brinkman v. Gilligan*, 518 F.2d 853, 855–56 (6th Cir. 1975):

> The District Court described the approved plan as "desegregative in intent" and concluded that it would have "an integrative effect." It appears that the plan contains some significant curricular innovations and that it would be a step toward integration of the Dayton school system. We believe, however, that more is required by the Constitution, by recent decisions of the Supreme Court, including those herein cited, and by the previous mandate of this court. As the appellants point out, under the plan approved by the District Court the basic pattern of one-race schools will continue largely unabated. The plan does not even purport to dismantle Dayton's one-race schools other than Miami Chapel and Roosevelt High School, and even if the magnet plans are successful, the vast majority of one-race

> schools will remain identifiable as such. The District Court's plan fails to eliminate the continuing effects of past segregation and is, therefore, inadequate.

The Court of Appeals sent the case back to the district court, and directed "that the court adopt a system-wide plan for the 1976–77 school year that will conform to the previous mandate of this court and to the decisions of the Supreme Court in *Keyes* and *Swann*." 518 F.2d at 857.

The Dayton Board of Education attempted to obtain Supreme Court review of the second decision of the Court of Appeals in the Dayton case. The Supreme Court refused to accept the case, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975), and the district court in Dayton was again faced with the question of what remedy was required. This time, the trial court ordered that in all but "exceptional circumstances" each school in the Dayton system must reflect a student racial balance within 15 percentage points of the percentage of black students in the system as a whole. This remedial order required the transportation of a substantial number of Dayton public school students. On July 26 of last year, the Court of Appeals approved this plan over the objections of the Dayton Board of Education. *Brinkman v. Gilligan*, 539 F.2d 1084 (6th Cir. 1976). The United States Supreme Court has recently agreed to review the Dayton Board's objections to the plan.

The developments in the Dayton case are important here in Columbus for two reasons. First, it is a recent case which sheds light upon the present state of the law governing desegregation remedies in this judicial circuit. The decisions of the United States Court of Appeals for the Sixth Circuit are binding precedent for this Court. Second, the Dayton case is important because the Supreme Court has recently agreed to hear the case and review the Sixth Circuit's decision in it. The Dayton case may provide a vehicle for the Supreme Court to elaborate more fully upon some of the themes discussed by three of its members in *Austin Independent School District*

*v. United States*, —— U.S. ——, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976). In the meantime, it is a fact of life that decisions such as those made by the Court of Appeals in the Dayton case reflect the state of the law concerning the appropriate remedy to be applied in the present case.

The concurring opinion of three justices in the *Austin* case and the recent decision of the Supreme Court accepting review of the Dayton remedy plan are circumstances which may lead some to believe that the law concerning remedy in desegregation cases is in a state of flux. If such soundings concerning the Supreme Court direction are correct, this may be a particularly auspicious time for the litigants to come together and attempt to reach an amicable and fair resolution of the questions presented by the remedy phase of this lawsuit. Meanwhile, it is the obligation of the Court to read the binding appellate court decisions and to act accordingly in the absence of an agreement reached by the parties.

Although the Court has heard volumes of evidence concerning the history and the present posture of the Columbus Public Schools, the Court has not heard the parties relative to the remedy phase of the litigation. Therefore, I cannot state with particularity a precise plan and the ramifications, economic and otherwise, which would result if a particular plan were in fact implemented. Without attempting to be precise, the Court would like to make certain suggestions to the parties which may be helpful in their attempt to negotiate a remedy or, if that is impossible, their preparation of a remedy plan for court review.

Unfortunately, two important considerations compete, both of which importantly impact any proposed desegregation remedy, whether it is imposed by a court or agreed upon by the litigants. On the one hand, there is the *Brown I* principle, still quite valid today, that unlawfully segregated schools are inherently unequal. Because black children are expected and required to grow up, live and work in a majority white society, it is not only unlawful, it is unfair

for public officials, by their actions or their inaction, to promote with segregative intent racially imbalanced schools. On the other hand, there is the fact that a desegregation remedy that may be so burdensome upon a school system as to impair its basic ability to provide the best possible educational opportunities, is no remedy at all. All parents and school children, regardless of color, have a very strong interest in quality schools.

The finding of liability in this case concerns the Columbus school district as a whole. Actions and omissions by public officials which tend to make black schools blacker necessarily have the reciprocal effect of making white schools whiter. "[I]t is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating 'feeder' schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white." *Keyes v. School District No. 1*, 413 U.S. 189, 201, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973) (footnote omitted). The evidence in this case and the factual determinations made earlier in this opinion support the finding that those elementary, junior, and senior high schools in the Columbus school district which presently have a predominantly black student enrollment have been substantially and directly affected by the intentional acts and omissions of the defendant local and state school boards.

I believe that it may be possible to eradicate unlawful segregation from the Columbus school system root and branch without embarking upon a scheme which envisions that every school in the district should have the same student racial breakdown as does the school district as a whole. In 1971 the United States Supreme Court held that racial balancing is not required by the Constitution:

> The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

. . . . .

Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum, the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court.

*Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 24, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). An equitable remedy in a school desegregation case such as this one should provide black school children with the *Brown I* promise of an integrated education, and should at the same time take into account the scope and effect of the actions and omissions upon which the finding of liability is premised.

It is plainly the case in Columbus that had school officials never engaged in a single segregative act or omission, the system-wide percentage of black students would nevertheless not be accurately reflected in each and every school in the district. System-wide statistical remedies have been implemented and approved by many courts, perhaps because of a concern that all schools, parents, children and neighborhoods should be required equally to bear the burdens of desegregation. The fact that such plans have been used in the past does not necessarily mean that they are the only legal alternatives available. In *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281, the Supreme Court stated:

> Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

In view of the findings of fact set forth in this opinion, it is essential that plaintiffs now be afforded relief; if they are not,

their constitutional rights will not be vindicated. Each black school child in Columbus must have an opportunity for the integrated education and attendant educational advantages contemplated by *Brown I* and the cases which have followed.

If a limited number of racially imbalanced, predominantly white schools remains under a plan or plans submitted for the Court's approval, those schools would receive close scrutiny under the *Swann* test, and the defendant school authorities would be required to satisfy the Court that their racial composition is not the result of present or past discriminatory actions or omissions of defendant public officials or their predecessors in office. As is noted earlier, it would be extremely difficult to attempt to roll back the clock at this point and determine what the school system would look like now had the wrongful acts and omissions discussed earlier in this opinion never occurred. Officials striving to satisfy the Court that a number of white schools are to remain such because of racially neutral circumstances would have a difficult, but perhaps not an impossible, task.

The foregoing comments and suggestions are by no means innovative. Generally, they incorporate the law as set forth by the United States Supreme Court in the *Swann* case and other cases. Nor are they exhaustive; they are meant only as a point of reference. In order to protect the opportunity for quality education for all the children of our community, the formulation of a fair and reasonable plan to remedy the ills that the Court has found must receive the best efforts of all involved in this complex litigation. The Court sincerely awaits the reception of an appropriate plan or plans providing a fair and lawful remedy for plaintiffs which will enhance the quality of education in Columbus.

## ORDER

The Court finds the issues joined in favor of all named plaintiffs and the class or classes they represent, and against defendants Columbus Board of Education and its members, the Superintendent of the Colum-

bus Public Schools, the State Board of Education of Ohio, and the State Superintendent of Public Instruction. The Court finds the issues joined in favor of the defendant Governor and Attorney General of the State of Ohio, and against all named plaintiffs and the class or classes they represent. Judgment concerning liability is entered in accordance with these findings. The Clerk will award all plaintiffs and the class or classes they represent those costs which are allowable to prevailing plaintiffs under the applicable law. These costs will be borne equally by the Columbus Board of Education and the State Board of Education. Pursuant to 28 U.S.C. § 1292(b), the Court certifies that with respect to the above findings of liability this judgment order involves controlling questions of law as to which there are substantial grounds for difference of opinion and further certifies that an immediate appeal from this judgment may materially advance the ultimate termination of this litigation.

It is ORDERED that the defendants Columbus Board of Education, State Board of Education, their constituent members, officers, agents, servants, employees, and all other persons in active concert or participation with them be, and they are hereby permanently enjoined from discriminating on the basis of race in the operation of the Columbus Public Schools, and from creating, promoting, or maintaining unconstitutional racial segregation in any Columbus school facilities.

Defendants Columbus Board of Education and State Board of Education are directed to formulate a. d submit to the Court proposed plans for the desegregation of the Columbus Public Schools beginning with the 1977–78 school year, within ninety (90) days of the entry of this order. Within twenty (20) days after the entry of this order, counsel shall advise the Court of the progress of any settlement negotiations concerning an agreed remedy plan.

It is further ORDERED that the Columbus Board of Education be, and it is hereby enjoined from proceeding with construction of new schools or additions to existing schools unless such construction has already commenced. Hereafter, such new construction may proceed only upon prior approval of this Court. It is further ORDERED that the Columbus Board of Education inform this Court and plaintiffs' counsel within twenty (20) days of any construction which has already commenced and of the stage of this construction.

It is so ORDERED.

## APPENDIX

### GLOSSARY

*Racially Identifiable (Imbalanced) and Racially Unidentifiable (Balanced)*—The concept of racial identifiability or unidentifiability is used to describe the relationship between the racial composition of a particular school and the racial composition of the system as a whole. A measure of statistical variance is applied to the actual (or estimated) system-wide percentage of black pupils. Schools which have a percentage of black pupils within this range are racially unidentifiable, or balanced. Schools which have a black population in excess of this range are racially identifiable, or imbalanced, black schools. Schools having a black population less than the range are racially identifiable, or imbalanced, white schools. The Court has accepted the figures used by Dr. Gordon Foster concerning the Columbus Public Schools:

| Year | Percentage Black Pupils in System | Statistical Variation | Range |
|---|---|---|---|
| 1950-57 | 15 % (estimate) | ± 5% | 10 % - 20 % |
| 1957 | 20 % (estimate) | ± 10% | 10 % - 30 % |
| 1964 primary | 25 % (estimate) | ± 15% | 10 % - 40 % |
| 1964 secondary | 26.6% | ± 15% | 11.6% - 41.6% |
| 1975 | 32.5% | ± 15% | 17.5% - 47.5% |

A smaller percentage standard deviation is applied when the system-wide percentage of blacks is low. As the total percentage of blacks increases, the statistical deviation also increases, thus resulting in a broader range of racial unidentifiability or balance.

Use of statistics in this manner provides a rough gauge which is a useful reference

point when examining particular schools. Standing alone, such statistics are of little evidentiary value.

*Black and Non-White*—Although some of the evidence, including some statistical data, presented at trial used the term "non-white," the Court has used the term "black" throughout this opinion since the evidence does not reflect that Columbus has any other substantial non-white population.

*Black School*—A school having a black student enrollment in excess of the applicable range of variance from the system-wide percentage of black pupils—that is, a racially identifiable black school. See "racially identifiable."

*White School*—A school having a black student enrollment which is less than the applicable variance from the system-wide percentage of black pupils—that is, a racially identifiable white school.

*One Race School*—A school in which 90% or more of the students are of a single race.

*Predominantly*—The term "predominantly" is used in this opinion in reference to the racial composition of both schools and neighborhoods. The meaning of the term is not subject to precise definition in terms of percentages, but is used to describe statistical racial composition that is substantially outside the range of statistical deviation from the system-wide or community-wide racial percentage. The term is also used to describe instances of racial imbalance from the viewpoint of the residents of Columbus; that is to say, it is used to describe those schools or neighborhoods which the average Columbus resident might describe as black or white.

*Dual School System*—A school system in which there is officially imposed racial segregation.

*Unitary School System*—A school system in which there is no, or insignificant, officially imposed racial segregation.

*Discontiguous Attendance Zone*—A school attendance zone from which the student residents must cross another attendance zone in order to reach their assigned school.

*Intact Busing*—The practice of transporting a class of students (often with their teacher) from one school to another, keeping the class as an identifiable unit at the receiving school for most purposes, with minimal interaction with the students at the receiving school.

*Magnet School*—A school with special programs or facilities and an open enrollment designed to attract students from other parts of the school system. Depending upon the location of the school and the availability of transportation, magnet schools may serve as a method of voluntary integration.

*Optional Attendance Zone*—A portion of a school attendance zone from which the students may opt to attend a specific school other than the one which otherwise serves that area. That is, the student has a choice as to which of two or more schools to attend.

*Pairing*—A method of improving the racial balance of two schools having diverse racial compositions by consolidating the two attendance areas into a single zone. All of the students in the consolidated attendance area are then assigned to one school for certain grade levels (for example, K–3) and to the other school for the remaining grades (for example, 4–6).

Gladstone, Duxberry Park, Linden,
Hamilton and Arlington Park
Elementary Schools

Map No. 1

Near-Bexley Option — Elementary Schools

Map No. 2

City of
Bexley

City of
Whitehall

Optional Zone

Fair Elementary
Attendance Area

Fairmoor Elementary
Attendance Area

Near-Bexley Option — Junior High Schools

Map No. 3

Eastmoor Jr.
Attendance Area

City of
Whitehall

Franklin Jr.
Attendance Area

City of
Bexley

Optional
Zone

Johnson Park
Attendance Area

Near-Bexley Option — Senior High Schools

Map No. 4

City of
Whitehall

East Sr.
Attendance Area

Optional Zone

City of
Bexley

Eastmoor Sr.
Attendance Area

Highland, West Mound and West Broad
Elementary Optional Zones

Map No. 5

West Broad
Elementary
Attendance Area

Highland--
West Broad
Optional
Zone

West Broad
Street

Highland--
West Mound
Optional Zone

Highland
Elementary
Attendance
Area

West Mound
Elementary
Attendance Area

Moler Elementary Discontiguous
Attendance Area

Map No. 6

Moler
Elementary

Alum Crest
Elementary

Moler
Discontiguous
Attendance Area